**Jose Luiz ORTIZ–BARRAZA,
Appellant,**

v.

**UNITED ·STATES of America,
Appellee.**

No. 74–1905.

United States Court of Appeals,
Ninth Circuit.

March 19, 1975.

Gilbert Veliz (argued), Tucson, Ariz., for appellant.

James E. Mueller, Asst. U. S. Atty. (argued), for appellee.

Before BARNES and CARTER, Circuit Judges, and LINDBERG, District Judge.*

## OPINION

LINDBERG, Senior District Judge:

The defendant has appealed from his conviction for violation of 21 U.S.C. §§ 952(a), 960(a)(1) (1970), importation of one thousand eighty-one pounds of marijuana, and of 21 U.S.C. § 841(a)(1) (1970), possession with intent to distribute the same marijuana. We affirm.

The two-count indictment was returned on January 24, 1974. After a plea of not-guilty, a motion to suppress evidence was filed by the defendant. Two hearings, one pre- and one post-trial, were held concerning the motion. On April 2, 1974, the motion to suppress was denied. Meanwhile, a trial to a jury had resulted in a guilty verdict on both counts. The district court entered judgment of conviction on April 2, 1974, and ordered the defendant committed. Notice of appeal was timely filed.

The only error asserted on appeal was the district court's denial of the motion

---

* Honorable William J. Lindberg, Senior United States District Judge, Western District of Washington, sitting by designation.

to suppress evidence. The defendant has urged that the search of his camper, in which the marijuana was discovered, was unlawful. In support of this proposition, it has been argued that the discovering tribal police officer acted in excess of his authority by conducting the search as part of an investigation of suspected state and federal law violations committed by the defendant, a non-Indian. In addition, the defendant has claimed that the search conducted violated constitutional prohibitions against unreasonable searches. We hold that the tribal officer acted within the scope of his authority and that the search conducted by him was reasonable under the circumstances.

The facts are not in dispute. On the morning of January 5, 1974, Officer Robert Antone, Jr., had been patrolling the streets of Sells, Arizona. Sells is within the confines of the Papago Indian Reservation. Antone was then employed by the tribe as a police officer, and he was using a police patrol car which was both distinctively marked and had red lights on top. Officer Antone had parked in front of the trading post on the main street in Sells and, subsequently, had observed a white Ford pickup truck, on which were mounted a camper and Arizona license plates. The truck had turned off the San Miguel Gate road onto the main street.

The truck and camper were muddy and dirty, and the curtains in the camper were closed. The San Miguel Gate road passes from Sells through San Miguel and on to the Mexican border.[1] From San Miguel to the border, the road is unpaved. Other roads in the area are also unpaved. There had been rain recently.

Antone observed the driver of the camper. The driver and sole occupant of the vehicle was a young Mexican male whom Antone did not recognize. The residents of the area near the San Miguel Gate road are either Papago Indians or priests and nuns associated with a mission at Topawa. It was Antone's testimony that he could recognize all of the non-Indians who lived in the vicinity of the San Miguel Gate road. Occasionally, of course, non-Indian visitors travel in the area.

Officer Antone decided to stop the driver of the camper and check the camper's registration and the license of the driver in order to ascertain to whom the vehicle belonged. Accordingly, Antone followed the camper onto the state highway. Before Antone was required to stop the camper, the driver had stopped of his own volition on the highway shoulder and had gotten out. Antone then turned on the flashing red lights mounted on the patrol car, drove up behind the camper and stopped. Antone approached the driver, who had not yet reentered the vehicle.

When Antone asked the driver, who was the defendant, for his driver's license and vehicle registration, the defendant stated in Spanish that he spoke no English. Because Antone spoke little Spanish, he frisked the defendant, looking for the identification papers sought. Finding neither driver's license nor registration, Antone had the defendant wait in the patrol car while the truck cab was checked for registration. No identifica-

1. Sells is approximately twenty miles from the Mexican border as the crow flies, approximately twenty-five miles from the Mexican border via the San Miguel Gate road. Between Sells and the border, the San Miguel Gate road is intersected by through highways only twice. These highways are, for the most part, ungraded and unimproved roads which connect the San Miguel Gate road with state highway eighty-six near Tracy and Gunsight, Arizona. These highways pass by the Mesquite Mountains and traverse the San Simon Wash and the Vamori Wash. The highways are some thirty-five or more miles in length. See Sheets Number 5, 6, and 10, General Highway Map of Pima County, Arizona, prepared by the Photogrammetry and Mapping Division of the Arizona Highway Department in cooperation with the United States Department of Commerce, Bureau of Public Roads (1961, revised 1972, 1974); and see, General Highway Map of Arizona, prepared by the Photogrammetry and Mapping Division of the Arizona Highway Department (1974). From these facts it appears that there is a high probability that a non-resident found travelling north on the San Miguel Gate road has crossed the international border.

tion papers were found either in the cab or on the ground near the vehicle.

At this point Officer Antone believed that he had discovered an alien who had entered the country and was transporting either illegal aliens or controlled substances. Antone determined to search the vehicle. Upon opening the camper door, burlap sacks containing the marijuana involved in this prosecution were discovered. The defendant was taken to the Papago detention facility and held for transfer to the drug enforcement administration.

Officer Antone has testified that he was employed by the Papago tribe rather than by the Department of the Interior, Bureau of Indian Affairs (BIA). Antone has also stated that he had not been granted a certificate which, under certain Arizona procedures, would have rendered him a peace officer for that state.

## I.

Indian tribes possess an inherent sovereignty except where it has been specifically taken away from them by treaty or act of Congress. United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 717–718, 42 L.Ed.2d 706 (1975); Iron Crow v. Oglala Sioux Tribe of Pine Ridge Reservation, South Dakota, 231 F.2d 89 (8th Cir. 1956). Intrinsic in this sovereignty is the power of a tribe to create and administer a criminal justice system. "An Indian tribe may exercise a complete [criminal] jurisdiction over its members and within the limits of the reservation subordinate only to the expressed limitations of federal law." F. Cohen, Handbook of Federal Indian Law 148 (1942 ed. as republished by the University of New Mexico Press). The status of Indian tribes as dependent sovereigns with inherent but limited powers (which include the power to draft a constitution and to enact law) has been recognized by Congress. 25 U.S.C. § 476 (1970).

Also intrinsic in the sovereignty of an Indian tribe is the power to exclude trespassers from the reservation.

1 Op. Atty. Gen. 465 (1821); Department of the Interior, Office of the Solicitor, Federal Indian Law 438, 439 (1958). A tribe needs no grant of authority from the federal government in order to exercise this power. F. Cohen, Handbook of Federal Indian Law 306 (1942 ed. as republished by the University of New Mexico Press). It has at times been held that tribes may not exercise criminal jurisdiction over non-Indians. Ex parte Kenyon, 14 Fed.Cas.No.7720 (1878). Such holdings, if presently valid, have not derogated from the sovereign power of tribal authorities to exclude trespassers who have violated state or federal law by delivering the offenders to the appropriate authorities.

Indian tribal police forces have long been an integral part of certain tribal criminal justice systems and have often performed their law enforcement duties to the limits of available jurisdiction. W. Hagan, Indian Police and Judges (1966). The propriety of operation of tribal police forces has been recognized, presently and in the past, by the federal government. 18 Op. Atty. Gen. 440 (1886); 25 U.S.C. § 13 (1970); Act of May 15, 1886, ch. 333, 24 Stat. 29, 43; 25 C.F.R. §§ 11.301 et seq. (1974). Thus, as a general proposition, we have little difficulty in concluding that an Indian tribe may employ police officers to aid in the enforcement of tribal law and in the exercise of tribal power.

On January 6, 1937, the Papago Indians adopted a constitution which was, in addition, approved by the BIA. Under the constitution the Papago Council was empowered, article five, section three:

(b) To provide for the maintenance of law and order and the administration of justice by establishing a tribal court . . . and a police force, and defining the powers and duties of such courts and police. (c) To remove or exclude from any of the three Papago Reservations non-members who occupy reservation land without lawful authority and whose presence may be injurious to the peace, happiness or welfare of the members of the tribe.

Pursuant to its constitution, the Papago Council adopted a code of law which contained the following provision, chapter six, section two:

> Any person, undesirable, not a member of the Papago Tribe who, within the Gila Bend, Sells and San Xavier Reservations, commits any act which is a crime under Federal or State Laws, or which would be a misdemeanor under the Ordinance of the Papago Tribe, if committed by a member thereof, may be forcibly ejected from these Reservations by any Police Officer, Officer of the United States Indian Service, or Tribal Police, and may be turned over to the custody of the United States Marshal or Sheriff or other officer of the State of Arizona, for prosecution under Federal or State Law.

On June 1, 1972, the Papago Council adopted a special resolution ordering an investigation to be made and the taking of other necessary action, including the hiring of additional policemen, in order to stop marijuana smuggling from Mexico into the United States through the Papago Reservation.

■ We find that the actions of the Papago Council, taken together with the Papago Constitution and the applicable law previously discussed, clearly establish the authority of a tribal police officer, like Officer Antone, to investigate any on-reservation violations of state and federal law, where the exclusion of the trespassing offender from the reservation may be contemplated. *Compare*, 25 C.F.R. § 11.304(b)(3).

■ Our holding, in a sense, parallels that rendered in Settler v. Lameer, 507 F.2d 231 (9th Cir., 1974). In *Settler* it was noted, in another context, that the power to regulate is only meaningful when combined with the power to enforce. That principle may be applied in the instant case. The power of the Papago to exclude non-Indian state and federal law violators from the reserva-

tion would be meaningless were the tribal police not empowered to investigate such violations. Obviously, tribal police must have such power.[2]

■ As a final word on the subject of Officer Antone's authority, we note that the fact that the events of interest here may have occurred within the right-of-way for a state highway avails the defendant nothing. Rights of way running through a reservation remain part of the reservation and within the territorial jurisdiction of the tribal police. *See*, Gourneau v. Smith, 207 N.W.2d 256 (N.Dak. 1973); 18 U.S.C. § 1151 (1970).

## II.

In searching the defendant and his camper, Officer Antone was required to avoid effecting a constitutionally unreasonable search. 25 U.S.C. § 1302(2) (1970). We hold that the search conducted in the instant case was reasonable.

■ In observing the unfamiliar and muddy camper driven by an unknown non-Indian and proceeding through the reservation coming from the direction of the Mexican border, Officer Antone acquired information sufficient to constitute a founded suspicion warranting a stop to check for a driver's license and registration. Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966). There is, of course, some question here whether a stop may be said to have occurred. The pat-down of the defendant was justifiable. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *and see*, United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

■ Officer Antone's founded suspicion ripened into probable cause to search the camper when no driver's license, registration or identification were discovered upon the defendant, and the proximity to Mexico together with the other facts previously adverted to sug-

---

2. If we are wrong, and Officer Antone did not have such power as a tribal police officer, then he was acting as an individual and his acts would not be within the scope of constitution-

al provisions. United States v. Ogden, 485 F.2d 536 (9th Cir. 1973); cert. den. 416 U.S. 987, 94 S.Ct. 2392, 40 L.Ed.2d 764 (1974).

gested an illegal crossing of the international border, perhaps involving smuggling of contraband. Such probable cause supported the inquiry which ultimately revealed the marijuana. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

## CONCLUSION

The judgment of the district court is affirmed. The tribal police officer was authorized to investigate within the reservation state and federal law violations thought to have been committed by non-Indian offenders. The search of the defendant and of the vehicle were reasonable under the circumstances.