[No. 58987-9. En Banc. May 6, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. DAVID P. SCHMUCK, *Petitioner*.

374

*The Norbut Law Firm,* by *Gregory P. Norbut,* for petitioner.

*C. Danny Clem, Prosecuting Attorney,* and *Pamela B. Loginsky, Deputy,* for respondent.

*John C. Sledd, Tribal Attorney,* on behalf of the Suquamish Indian Tribe, amicus curiae for respondent.

*Christine O. Gregoire, Attorney General,* and *John W. Hough, Deputy,* amicus curiae for respondent.

*Robert S. Mueller III, Assistant Attorney of the United States,* and *John T. Bannon, Jr.,* amicus curiae for respondent.

JOHNSON, J. — At issue is whether an Indian tribal police officer has authority to stop and detain a non-Indian who allegedly violates state and tribal law while traveling on a public road within a reservation until that person can be turned over to state authorities for charging and prosecution. Petitioner David P. Schmuck was found guilty of driving while intoxicated on the Port Madison Reservation after being detained by a Suquamish tribal officer and turned over

to the Washington State Patrol. Kitsap County Superior Court denied his appeal and affirmed the conviction. We affirm.

I

The parties have stipulated to the facts. Clerk's Papers, at 132-41, 146-50. Suquamish Tribal Police Officer Bailey is commissioned by the Suquamish Indian Tribe (Tribe) to enforce tribal laws within the geographic confines of the Port Madison Reservation (Reservation). The Port Madison Reservation is located in Kitsap County, Washington.

On September 2, 1991, at approximately 7:30 p.m., Tribal Officer Bailey observed a blue Ford pickup truck traveling southbound on Brockton Avenue, a road running through the Reservation. The truck was obviously exceeding the posted 25 m.p.h. speed limit; the officer's radar reading indicated 36 m.p.h. Officer Bailey turned on his emergency lights and pursued the truck, which responded by speeding up. Officer Bailey turned on his siren and continued to follow the truck down multiple streets of the Reservation. After running a stop sign and continuing to accelerate, the truck finally came to a stop on the side of the road.

Officer Bailey approached the pickup truck, advised the driver of the reason for the stop, and requested his driver's license. The license identified the driver as petitioner, David P. Schmuck (Schmuck). Schmuck is not an enrolled member of any recognized Indian tribe, maintains no social ties with any tribe, and is not aware of any Indian ancestors.

Schmuck smelled of intoxicants. Officer Bailey asked him if he had been drinking, and Schmuck said, "I've had a few". Officer Bailey then asked him if he would be willing to take a few field sobriety tests. Schmuck declined. Because Schmuck was a non-Indian, Officer Bailey informed him that he would be detained until the Washington State Patrol could respond[1]

---

[1]Tribal Officer Bailey was not cross-deputized by the Kitsap County Sheriff's Department or the Washington State Patrol. The Suquamish Tribal Police Department has not entered into a mutual aid agreement with the Kitsap County Sheriff's Department or the Washington State Patrol. Clerk's Papers, at 132. Previously, the Tribe had a cooperative agreement with Kitsap County. The County,

to their location to investigate whether Schmuck had been driving while under the influence of alcohol or drugs (DWI).

After some discussion, Schmuck agreed to perform some field sobriety tests.[2] After reviewing the results, Officer Bailey again advised Schmuck that he was being detained until the State Patrol arrived. At approximately 7:40 p.m., Officer Bailey requested assistance from the Washington State Patrol. Trooper Clark arrived at the scene around 8 p.m.

Trooper Clark contacted Schmuck, who was sitting in the truck, and detected a strong odor of intoxicants. Schmuck's eyes were bloodshot and watery. The trooper asked Schmuck to step from the vehicle; Schmuck complied very slowly and walked across the street to Clark's patrol car with a zigzag staggering motion.

Schmuck performed four field sobriety tests and failed them all. Based upon Officer Bailey's report of Schmuck's driving, Schmuck's performance on the field sobriety tests, and the smell of liquor, Trooper Clark advised Schmuck of his constitutional rights and placed him under arrest for DWI. Schmuck was transported to Kitsap County Jail, where he was again advised of his constitutional rights and implied consent warnings. Schmuck voluntarily waived his rights and agreed to answer questions on the alcohol arrest report form. He stated he had consumed a couple of beers, but did not believe his driving was affected by his alcohol use. A BAC Verifier DataMaster was administered at 9:11 p.m., resulting in readings of .17 and .17 grams of alcohol per 210 liters of breath. Clerk's Papers, at 148-50.

---

however, refused to share any of the revenue collected with the Tribe. Subsequently, the County elected not to continue a cooperative traffic enforcement program with the Tribe. Brief of Respondent, at 12 (quoting Suquamish Tribal Law and Order Code 10.1.3).

[2]Although not included in the stipulation of facts, both parties noted in their briefs that the specific tests included a "horizontal gaze nystagmus" and a breath test on an ALCO-SENSOR portable breath testing machine. Schmuck's breath sample registered .201. During the eye test, neither of Schmuck's eyes "pursued smoothly", and the onset of the nystagmus was prior to 45 degrees. Brief of Petitioner, at 4-5; Brief of Respondent, at 5.

On December 23, 1991, judgment was entered against Schmuck in Kitsap County District Court for driving while under the influence of intoxicating liquor in violation of RCW 46.61.502. Kitsap County Superior Court denied Schmuck's appeal and affirmed his DWI conviction, holding that the Suquamish tribal officer had authority to stop and detain Schmuck. This court granted direct review pursuant to RAP 4.2(a)(4).

## II

We address three issues presented for review. First, does an Indian tribal officer have inherent authority to stop a non-Indian driving a motor vehicle on a public road within the reservation to investigate a possible violation of tribal law? Second, does a tribal officer have inherent authority to detain a non-Indian motorist who has allegedly violated state and tribal law while on the reservation until he or she can be turned over to state authorities for charging and prosecution? Third, if an Indian tribe does have such inherent authority, has that authority been divested by the State's enactment of RCW 37.12.010 assuming criminal and civil jurisdiction over the operation of motor vehicles on Indian territory and reservations?

We begin by noting that the Suquamish Indian Tribe did not assert authority to prosecute Schmuck for driving while intoxicated, speeding, or running a stop sign. Indian tribal courts do not have inherent jurisdiction to try and punish non-Indians who commit crimes on their land. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212, 55 L. Ed. 2d 209, 98 S. Ct. 1011 (1978). Instead, criminal offenses occurring on a reservation by non-Indians are subject to prosecution by state or federal governments, depending on the offense. Thus, the question presented is not whether the Suquamish Indian Tribe had authority to *prosecute* Schmuck, but rather, whether the Tribe had authority to *stop* and *detain* Schmuck until he could be turned over to state governmental officials who did have authority to prosecute.[3]

---

[3]We note that Schmuck's assignment of error is limited to the sole question of whether the Tribe has inherent *authority* to stop and detain. He does not challenge

Schmuck first argues that Tribal Officer Bailey did not have inherent authority to *stop* Schmuck's vehicle. We disagree. A review of United States Supreme Court precedent indicates that Indian tribes are limited sovereigns which retain the power to prescribe and enforce internal criminal and civil laws. This power necessarily includes the authority to stop a driver on the reservation to investigate a possible violation of tribal law and determine if the driver is an Indian, subject to the jurisdiction of that law.

■ Jurisdictional disputes on Indian reservations often involve questions of overlapping federal, state, and tribal jurisdiction. *See* F. Cohen, *Federal Indian Law* ch. 6 (1982); Note, *Falling Through the Cracks After* Duro v. Reina: *A Close Look at a Jurisdictional Failure*, 15 U. Puget Sound L. Rev. 229, 230-35 (1991). Whether the Suquamish Indian Tribe has authority to stop and detain a non-Indian necessarily turns on an analysis of the limited sovereignty retained by the Tribe.

■ In analyzing issues of Indian sovereignty, "[i]t must always be remembered that the various Indian tribes were once independent and sovereign nations . . .." *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973). However, when Indian tribes were incorporated into United States territory and accepted protection by the federal government, they necessarily lost some of their sovereign powers:

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

*United States v. Wheeler*, 435 U.S. 313, 323, 55 L. Ed. 2d 303, 98 S. Ct. 1079 (1978).

---

the *reasonableness* of that detention, include any arguments in his brief, or present any evidence that the detention was in fact unreasonable. This court will not consider an issue on appeal that is not raised by an assignment of error or supported by argument and citation of authority. *McKee v. American Home Prods. Corp.*, 113 Wn.2d 701, 705, 782 P.2d 1045 (1989). Therefore, we do not address any arguments by respondent or amicus curiae regarding the scope of the detention.

■ Despite their limited sovereignty, Indian tribes also have a dependent status, in which some aspects of their sovereignty have been either expressly or implicitly divested. Normally, "[a] basic attribute of full territorial sovereignty is the power to enforce laws against all who come within the sovereign's territory, whether citizens or aliens". *Duro v. Reina*, 495 U.S. 676, 685, 109 L. Ed. 2d 693, 110 S. Ct. 2053 (1990). However, tribes can no longer be described as sovereigns in this sense. Rather, tribes only retain that sovereignty which is needed to control the tribe's internal relations and to preserve their own unique customs and social order. *Duro*, 495 U.S. at 685-86.

Thus, although the status of tribes is that of a limited sovereign, tribes still retain their power of internal self-governance. *Duro*, 495 U.S. at 686. This power includes "the power to prescribe and enforce internal criminal laws". *Wheeler*, 435 U.S. at 326. This power is part of a tribe's "primeval sovereignty", that is, "part of [the tribe's] own retained sovereignty". *Wheeler*, 435 U.S. at 328. This inherent authority is the source of an Indian tribe's power to create and administer an internal criminal justice system, *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975), including "the inherent power to prescribe laws for their members and to punish infractions of those laws". *Wheeler*, 435 U.S. at 323.

An Indian tribe may also regulate the conduct of its members on the reservation. *Montana v. United States*, 450 U.S. 544, 564, 67 L. Ed. 2d 493, 101 S. Ct. 1245 (1981). For example, the Ninth Circuit has acknowledged a tribe's authority to enact a civil traffic code, including speed limits, which it can enforce against on-reservation Indians. *See Confederated Tribes of Colville Reservation v. Washington*, 938 F.2d 146, 149 (9th Cir. 1991), *cert. denied*, ___ U.S. ___, 118 L. Ed. 2d 412, 112 S. Ct. 1704 (1992). Moreover, where a tribe has shown that its own highway safety laws and institutions are adequate for self-government, the Ninth Circuit held the State may not assert jurisdiction to enforce the State's civil traffic regulations, such as speed limits, against tribal mem-

bers operating motor vehicles upon public roads within the reservation. *Confederated Tribes*, 938 F.2d at 149.[4]

In the exercise of this recognized jurisdiction, the Suquamish Indian Tribe enacted various ordinances regulating its members' conduct upon the Reservation's roads and highways. These ordinances are codified in the Suquamish Tribal Law and Order Code (S.T.C.). These ordinances include S.T.C. 10.1.19, which authorizes tribal officers to issue citations or arrest a tribal member for driving while intoxicated or driving in a reckless and negligent manner. S.T.C. 10.1.33 and 10.1.21 require tribal members to observe posted speed limits and obey stop signs. *See also* S.T.C. 10.1.9 (authority to issue notice of traffic infraction).

The Suquamish Indian Tribe employs police officers, including Officer Bailey, to enforce its tribal law and order code. "The propriety of [operating] . . . tribal police forces has been recognized, presently and in the past, by the federal government". An Indian tribe "may employ police officers to aid in the enforcement of tribal law and in the exercise of tribal power". *Ortiz-Barraza*, 512 F.2d at 1179.

Fundamental to enforcing any traffic code is the authority by tribal officers to stop vehicles violating that code on roads within a reservation. In this case, Officer Bailey was exercising the Tribe's authority to enforce its traffic code when he observed the speeding pickup truck and pursued it through the streets of the Reservation. When he first saw the truck, he had no means of ascertaining whether the driver was an

---

[4]In *Confederated Tribes*, the Ninth Circuit held the State does not have jurisdiction over tribal members on the reservation for purposes of enforcing civil traffic laws against tribal members. *Confederated Tribes*, 938 F.2d at 149. Schmuck argues that because the Ninth Circuit held that tribes have exclusive jurisdiction over civil traffic infractions by tribal members, then the State must necessarily have exclusive jurisdiction over traffic violations by non-Indians. Schmuck's argument is not persuasive. Given the complexities of tribal, state, and federal jurisdiction over Indians and non-Indians on reservations, *Confederated Tribes* cannot support such a conclusion. The Ninth Circuit addressed only State jurisdiction over civil traffic infractions by Indians, not authority to detain non-Indians for civil infractions like speeding or for criminal violations like DWI.

Indian. Only by stopping the vehicle could he determine whether the driver was a tribal member, subject to the jurisdiction of the Tribe's traffic code. The alternative would put tribal officers in the impossible position of being unable to stop any driver for fear they would make an unlawful stop of a non-Indian. Such a result would seriously undercut the Tribe's ability to enforce tribal law and would render the traffic code virtually meaningless. It would also run contrary to the "well-established federal 'policy of furthering Indian self-government.' " *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62, 56 L. Ed. 2d 106, 98 S. Ct. 1670 (1978) (quoting *Morton v. Mancari*, 417 U.S. 535, 551, 41 L. Ed. 2d 290, 94 S. Ct. 2474 (1974)).

We hold Suquamish Tribal Officer Bailey had the requisite authority to stop Schmuck to investigate a possible violation of the Suquamish traffic code and to determine if Schmuck was an Indian, subject to the code's jurisdiction.

### III

Schmuck next contends that even if Tribal Officer Bailey had authority to stop him, Officer Bailey did not have inherent authority to *detain* him once Bailey determined that Schmuck was a non-Indian. Schmuck contends this detention violated the Washington State Constitution, article 1, section 7, in which "[n]o person shall be disturbed in his private affairs, or his home invaded, *without authority of law*". (Italics ours.) We disagree. The Suquamish Indian Tribe expressly retained in its treaty the Tribe's inherent authority to detain offenders and turn them over to government officials for prosecuting. Moreover, this authority has been recognized by both the United States Supreme Court and the Ninth Circuit.

In 1855, the Tribe entered into the Treaty of Point Elliott (Treaty), Jan. 22, 1855, 12 Stat. 927, and agreed to settle on a 7,276-acre reservation near Port Madison, Washington. *Oliphant*, 435 U.S. at 192-93. The Port Madison Reservation is a checkerboard consisting of tribal community land, allot-

ted Indian land (so-called "Indian Trust Land"), property held in fee simple by non-Indians, and various roads and public highways maintained by Kitsap County. *Oliphant*, 435 U.S. at 193. According to *Oliphant*, approximately 37 percent of the Reservation is Indian land, subject to the trust status of the United States. The other 63 percent is owned in fee simple by non-Indians. *Oliphant*, 435 U.S. at 193 n.1. However, all of the property within the geographic boundaries of the Reservation, including the land owned by non-Indians, is defined in federal law as "Indian country". 18 U.S.C. § 1151(a); *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 357-58, 7 L. Ed. 2d 346, 82 S. Ct. 424 (1962).

■ Prior to signing the Treaty, the Suquamish Indian Tribe began its "relationship with the Federal Government as a sovereign power" and its "criminal jurisdiction, no less than its civil jurisdiction, was that of any sovereign power". *Powers of Indian Tribes*, 55 Interior Dec. 14, 19, 57, 1 Opinions of Solicitor, Department of Interior, Indian Affairs 445, 447, 472 (Oct. 25, 1934). By the Treaty and by Congress' plenary legislative authority over Indians, *e.g., Delaware Tribal Business Comm. v. Weeks*, 430 U.S. 73, 83-84, 51 L. Ed. 2d 173, 97 S. Ct. 911 (1977), the Tribe gave up some, but not all, of its territory and sovereignty. The Treaty was "not a grant of rights to the Indians, but a grant of rights from them — *a reservation of those not granted*". (Italics ours.) *United States v. Winans*, 198 U.S. 371, 381, 49 L. Ed. 1089, 25 S. Ct. 662 (1905); *United States v. Moore*, 62 F. Supp. 660, 666 (W.D. Wash. 1945), *aff'd*, 157 F.2d 760 (9th Cir. 1946), *cert. denied*, 330 U.S. 827, 91 L. Ed. 1277, 67 S. Ct. 867 (1947). Thus, within its remaining territory, the Suquamish Indian Tribe's aboriginal powers are reserved unless limited by the United States' superior power. *E.g., United States v. Wheeler*, 435 U.S. 313, 323, 55 L. Ed. 2d 303, 98 S. Ct. 1079 (1978); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 560-61, 8 L. Ed. 483 (1832).

Article 9 of the Treaty of Point Elliott *expressly* provides that the Tribe shall turn over to government authorities any

intruder on the Reservation who has violated United States law:

> the said tribes agree not to shelter or conceal offenders against the laws of the United States, but *to deliver them up to the authorities for trial.*

(Italics ours.) Treaty of Point Elliott, art. 9, 12 Stat. 927 (1855). This provision appears to reflect a common concern of the federal government during treaty negotiations in the mid-1800's to prevent non-Indians from hiding out on reservations in the mistaken belief that they would be free from prosecution for their crimes. *See, e.g.,* H.R. Rep. No. 474, 23rd Cong., 1st Sess., at 98 (1834) (federal government to protect Native people from "unprincipled white men" entering Indian country, "where they fancy themselves free from punishment").

Treaty provisions reserving tribal powers are subject to certain canons of construction. Powers reserved by a tribe in its treaty may still be exercised, unless curtailed by later federal congressional action. *E.g., Wheeler,* 435 U.S. at 323; *Worcester,* 31 U.S. at 560-61. Treaties must be construed liberally for the benefit of the Indians, *e.g., Choctaw Nation v. United States,* 318 U.S. 423, 431-32, 87 L. Ed. 877, 63 S. Ct. 672 (1943), and as the Indians would have understood them. *E.g., Choctaw Nation v. Oklahoma,* 397 U.S. 620, 631, 25 L. Ed. 2d 615, 90 S. Ct. 1328 (1970); *Pioneer Packing Co. v. Winslow,* 159 Wash. 655, 661, 294 P. 557 (1930). Ambiguities must be resolved in favor of the Indians. *E.g., McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973). In addition, the court may consider the practical construction given the treaty by the parties. *E.g., United States v. Top Sky,* 547 F.2d 486, 487 (9th Cir. 1976). These canons compensate for the non-Indian party's "presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded . . .." *Washington v. Washington Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675-76, 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979).

Applying these principles to the Point Elliott treaty, article 9 specifically authorizes the Suquamish Indian Tribe to detain alleged offenders of United States laws and turn them over to government officials for prosecution. Support for this authorization may be found in two opinions of the United States Supreme Court: *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 55 L. Ed. 2d 209, 98 S. Ct. 1011 (1978) and *Duro v. Reina*, 495 U.S. 676, 109 L. Ed. 2d 693, 110 S. Ct. 2053 (1990).

*Oliphant* involved crimes by two non-Indians on the Port Madison Reservation. *Oliphant*, 435 U.S. at 194. The United States Supreme Court held that the Suquamish Tribal Court did not have criminal jurisdiction to try and punish non-Indians absent affirmative delegation of that power by Congress. *Oliphant*, 435 U.S. at 207-08. The Court noted that when the Tribe entered into the Treaty of Point Elliott, the Tribe acknowledged its dependence upon the United States, and in all probability was recognizing "that the United States would arrest and try non-Indian intruders who came within their Reservation". *Oliphant*, 435 U.S. at 207. Relying on the language from article 9, the Court concluded the Tribe is obligated to deliver a non-Indian offender to government authorities for prosecution:

> Thus the Tribe "agree[s] not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial." Read in conjunction with 18 U. S. C. § 1152, which extends federal enclave law to non-Indian offenses on Indian reservations, *this provision implies that the Suquamish are to promptly deliver up any non-Indian offender, rather than try and punish him themselves.*

(Italics ours.) *Oliphant*, 435 U.S. at 208.[5]

 Schmuck contends that the Supreme Court's decision in *Oliphant* bars tribal police from exercising *any* authority

---

[5]In a case directly on point, the New Mexico Court of Appeals also looked to this language from *Oliphant* and held that an Indian tribal officer had inherent authority to detain a non-Indian offender and deliver him or her to state authorities, even though the officer was not cross-commissioned by state police. *State v. Ryder*, 98 N.M. 453, 649 P.2d 756, *aff'd on other grounds*, 98 N.M. 316, 648 P.2d 774 (1982).

over non-Indians. We disagree. *Oliphant* holds that tribal courts do not have criminal jurisdiction to *try and punish* non-Indian offenders. At the same time, the Court *acknowledged* the continuing vitality of the Tribe's power, reserved in article 9, to detain offenders and turn them over to governmental authorities who do have authority to prosecute.

More recently, the Supreme Court again acknowledged a tribe's power to detain. *Duro*, 495 U.S. at 696-97. In *Duro*, the Supreme Court held that an Indian tribe may not assert criminal jurisdiction over a nonmember Indian for misdemeanor crimes.[6] *Duro*, 495 U.S. at 688. In response to concerns that a lack of tribal jurisdiction would allow nonmember Indians to violate the law with impunity while on the reservation, the Court responded that alleged offenders need not go free:

> The tribes also possess their traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands. . . . Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them. Where jurisdiction to try and punish an offender rests outside the tribe, *tribal officers may exercise their power to detain the offender and transport him to the proper authorities.*

(Citations omitted. Italics ours.) *Duro*, 495 U.S. at 696-97.

Thus, twice the Supreme Court has stated that a tribe's proper response to a crime committed by a non-Indian on the reservation is for the tribal police to detain the offender and deliver him or her to the proper authorities.[7] This is precisely

---

[6]In 1991, Congress overruled the holding in *Duro* by passing legislation declaring that tribes possess inherent criminal jurisdiction over all Indians. Pub. L. No. 102-137, § 1, 105 Stat. 646 (1991). Nevertheless, *Duro*'s reasoning that tribes have inherent sovereignty to detain and deliver offenders is still sound. In fact, it is supported by Congress' action in affirming tribal criminal jurisdiction over all Indians, action which is consistent with the federal policy of furthering Indian self-government. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62, 56 L. Ed. 2d 106, 98 S. Ct. 1670 (1978). Holding that tribes have inherent sovereignty to detain and deliver offenders is also consistent with that policy.

[7]Additional support for the Supreme Court's construction of article 9 in *Oliphant* and *Duro* can be found in the dissent to the Court of Appeals' opinion in

what Tribal Officer Bailey did: he detained Schmuck and promptly delivered him up, in accordance with *Oliphant*'s and *Duro*'s directive.

In addition to the Supreme Court, the Ninth Circuit has squarely addressed the issue of tribal authority to detain a non-Indian in a case directly on point. *Ortiz-Barraza v. United States*, 512 F.2d 1176 (9th Cir. 1975). In *Ortiz*, a tribal police officer observed a camper truck driving through an Indian reservation under suspicious circumstances indicating the driver might be an illegal alien. The officer followed the truck onto a state highway running through the reservation and stopped the driver. When the driver could not produce a driver's license or vehicle registration, the officer checked the truck for identification papers and discovered marijuana. The driver, a non-Indian, was detained by the tribal police and transferred to drug enforcement officials. *Ortiz-Barraza,* 512 F.2d at 1178-79.

The Ninth Circuit held that an Indian tribe has inherent authority to stop and detain a non-Indian allegedly violating state or federal law on public roads running through the reservation until the non-Indian can be turned over to the appropriate authorities. *Ortiz-Barraza*, 512 F.2d at 1180. According to the court, this power exists *regardless* of the fact that tribes have been divested of their power to exercise criminal jurisdiction:

---

*Oliphant*, which was reversed by the Supreme Court. *Oliphant v. Schlie*, 544 F.2d 1007 (9th Cir. 1976), *rev'd*, 435 U.S. 191, 55 L. Ed. 2d 209, 98 S. Ct. 1011 (1978). The Supreme Court opinion in *Oliphant* largely adopted the position of this dissent, written by Justice Kennedy while still sitting on the Ninth Circuit. Justice Kennedy subsequently wrote the majority opinion in *Duro*. The dissent states:

> It is important to focus on the precise issue in this case [*Oliphant*]. We are not considering whether Indian tribes may pass reservation ordinances, having the force of law, governing the conduct of the tribe's members; they may. . . . Nor are we determining whether Indians have the right to exclude from the reservation nonmembers they deem undesirable; they have. . . . *Nor is there any question of potential lawbreakers going unpunished*, a point given special emphasis by the majority, for we have held that *tribal authorities have the power to apprehend violators of state and federal law and to deliver the offenders to the appropriate authority. Oriz [sic]-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975).

(Footnote and citations omitted. Italics ours.) *Oliphant v. Schlie*, 544 F.2d at 1014 (Kennedy, J., dissenting).

> It has at times been held that tribes may not exercise criminal jurisdiction over non-Indians. Such holdings . . . have not derogated from the *sovereign power* of tribal authorities to exclude trespassers who have violated state or federal law by *delivering the offenders to the appropriate authorities.*

(Citation omitted. Italics ours.) *Ortiz-Barraza,* 512 F.2d at 1179. Although this case was decided prior to *Oliphant,* the above language is consistent with both *Oliphant* and *Duro.*

The Ninth Circuit based its finding of authority, in part, on the Tribe's traditional inherent authority to exclude: "Also intrinsic in the sovereignty of an Indian tribe is the power to exclude trespassers from the reservation. A tribe needs no grant of authority from the federal government in order to exercise this power." (Citation omitted.) *Ortiz-Barraza,* 512 F.2d at 1179. *See also New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 333, 76 L. Ed. 2d 611, 103 S. Ct. 2378 (1983). The Suquamish Indian Tribe also reserved its inherent right to exclude or to condition the presence of trespassers on the Port Madison Reservation in the Treaty of Point Elliott. In article 2, the Treaty sets aside land for the "exclusive use" of the tribes, "nor shall any white man be permitted to reside upon the same without permission of the said tribes . . .." Treaty of Point Elliott, art. 2, 12 Stat. 927 (1855).

Amicus Washington State Patrol argues the Suquamish Indian Tribe no longer has the power to exclude from its Reservation or the lesser included power to detain, in particular because Schmuck was traveling on a public road in the Reservation. The State Patrol argues that the language from *Duro* citing the power to exclude applies only to *tribal* land, not public roads. *See Duro,* 495 U.S. at 696-97.

In *Ortiz-Barraza,* the Ninth Circuit explicitly rejected amicus' argument that a tribe does not possess the power to detain when a non-Indian is traveling on a public road:

> [T]he fact that the events of interest here may have occurred within the right-of-way for a state highway avails the defendant nothing. Rights of way running through a reservation *remain part of the reservation and within the territorial jurisdiction of the tribal police.*

(Italics ours.) *Ortiz-Barraza,* 512 F.2d at 1180 (citing *Gourneau v. Smith,* 207 N.W.2d 256 (N.D. 1973)).

We agree with the Ninth Circuit. Just because Schmuck's offense was committed on a public road does not mean he is immune from tribal authority. By federal statute, "Indian country" is defined as all land within the limit of any Indian reservation, "notwithstanding the issuance of any patent, and, *including rights-of-way*". (Italics ours.) 18 U.S.C. § 1151. *See, e.g., DeCoteau v. District Cy. Court,* 420 U.S. 425, 427 n.2, 43 L. Ed. 2d 300, 95 S. Ct. 1082 (1975) (land within reservation is subject to tribal and federal jurisdiction including rights of way); *Confederated Tribes of Colville Reservation v. Washington,* 938 F.2d 146, 146 (9th Cir. 1991) (public roads are within and therefore part of the reservation), *cert. denied,* ___ U.S. ___, 118 L. Ed. 2d 412, 112 S. Ct. 1704 (1992); *Enriquez v. Superior Court,* 115 Ariz. 342, 565 P.2d 522 (1977) (granting of easement for public highway running through reservation does not alter status as "Indian country"). Thus, public roads remain part of the Reservation and are within the territorial jurisdiction of the Suquamish tribal police, at least for the limited purpose of asserting the Tribe's authority to detain and deliver alleged offenders.

The State Patrol argues, however, that recognizing tribal authority to detain will *necessarily* result in additional tribal regulation of roads running through the Reservation, such as adopting different speed limits or building toll booths. While we acknowledge the concerns of the State Patrol, we think these fears are unwarranted. Holding the Tribe has expressly reserved a *limited* authority to stop and detain alleged offenders in no way confers an *unlimited* authority to regulate the right of the public to travel on the Reservation's roads.

We also note that the Tribe's authority to stop and detain is not necessarily based *exclusively* on the power to exclude non-Indians from tribal lands, but may also be derived from the Tribe's general authority as sovereign. *See Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 71 L. Ed. 2d 21, 102 S. Ct. 894 (1982) (tribe's power to tax non-Indians does not derive solely from power to exclude but from general

authority as sovereign to control economic activity within its jurisdiction). Although we recognize that a tribe's inherent sovereign powers do not generally extend to the activities of nonmembers of the tribe, *Montana*, 450 U.S. at 565, tribes still retain some limited authority to regulate the conduct of non-Indians on reservation land:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, *even on non-Indian fee lands*. . . . A tribe may also retain inherent power to exercise civil authority over the *conduct of non-Indians on fee lands within its reservation when that conduct threatens* or has some direct effect on the political integrity, the economic security, or the *health or welfare* of the tribe.

(Italics ours.) *Montana v. United States*, 450 U.S. 544, 565-66, 67 L. Ed. 2d 493, 101 S. Ct. 1245 (1981). Allowing a known drunk driver to get back in his or her car, careen off down the road, and possibly kill or injure Indians or non-Indians would certainly be detrimental to the health or welfare of the tribe.

As a practical matter, the Suquamish Indian Tribe provides most of the law enforcement patrols on the Reservation. The Tribe employs five full-time officers to patrol the Reservation, whereas no state or federal law enforcement officers are assigned solely to that area. Brief of Amicus Suquamish Indian Tribe app. C. Kitsap County assigns approximately three deputies to north Kitsap County, but they must patrol an area substantially larger than the Reservation. Holding that the Tribe does not have a limited authority to stop and detain alleged offenders who present a clear threat to community members would severely hamper the Tribe's ability to protect the welfare of Indians, as well as non-Indians, on the Reservation.

In this case, if the Suquamish Indian Tribe did not have the authority to detain, Schmuck would have been free to drive away with an alcohol level exceeding the limit for legal intoxication. In the 20 minutes it took for Trooper Clark to respond, Schmuck could have easily caused extensive property damage or seriously injured other motorists. He also

could have left the Reservation and eluded capture by the State Patrol. As the New Mexico Court of Appeals noted:

> To hold that an Indian police officer may stop offenders but upon determining they are non-Indians must let them go, would be to subvert a substantial function of Indian police authorities and produce a ludicrous state of affairs which would permit non-Indians to act unlawfully, with impunity, on Indian lands.

*State v. Ryder*, 98 N.M. 453, 456, 649 P.2d 756, *aff'd on other grounds*, 98 N.M. 316, 648 P.2d 774 (1982). Nothing in *Oliphant*, *Duro*, or *Ortiz-Barraza* supports such a result. Quite the opposite. These cases support the position that tribes can detain any such offender and "promptly deliver him or her up" to the appropriate officials who are authorized to prosecute.

Finally, the State Patrol urges this court to base a tribal officer's authority to detain on a citizen's arrest theory. We decline its invitation. There would be a serious incongruity in allowing a limited sovereign such as the Suquamish Indian Tribe to exercise no more police authority than its tribal members could assert on their own. Such a result would seriously undercut a tribal officer's authority on the reservation and conflict with Congress' well-established policy of promoting tribal self-government. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62, 56 L. Ed. 2d 106, 98 S. Ct. 1670 (1978). Potentially, DWI drivers would simply drive off or even refuse to stop if pulled over by a tribal officer with only a citizen's arrest capability.

We conclude an Indian tribal officer has inherent authority to stop and detain a non-Indian who has allegedly violated state and tribal law while on the reservation until he or she can be turned over to state authorities for charging and prosecution. We hold Tribal Officer Bailey, as a police officer employed by the Suquamish Indian Tribe, had authority to stop and detain Schmuck, who was allegedly driving while intoxicated on the Reservation, until he could be turned over to the Washington State Patrol for charging and prosecution.

## IV

Schmuck contends that even if the Tribe did have inherent authority to stop and detain him, that authority was divested by the State's enactment of RCW 37.12.010. Schmuck argues that the statute gives the State *exclusive* jurisdiction over motor vehicle offenses committed on reservation land, citing *Makah Indian Tribe v. State*, 76 Wn.2d 485, 457 P.2d 590 (1969).

By enacting RCW 37.12.010, the State of Washington assumed criminal and civil jurisdiction over Indians and Indian territory and reservations. RCW 37.12.010. The statute specifically provides for the assumption of jurisdiction over Indians on reservations for the "operation of motor vehicles upon the public streets, alleys, roads and highways". RCW 37.12.010(8).

In *Makah*, this court held that vehicles being operated by Indians upon public roads running through a reservation are subject to jurisdictional control of the State pursuant to RCW 37.12.010. *Makah*, 76 Wn.2d at 493. Schmuck argues that *Makah*, read in conjunction with RCW 37.12.010, vests *exclusive* jurisdiction over motor vehicles in the State.

*Makah* is not dispositive. Nothing in *Makah* makes such a clear statement that RCW 37.12.010 grants *exclusive* jurisdiction to the State. The issue in *Makah* pertained only to questions of state jurisdiction *over Indians* on the Makah Reservation. It did not address issues of jurisdiction over non-Indians or exclusivity of jurisdiction.

*Makah* notwithstanding, Schmuck argues that RCW 37.12.010 divested the Tribe of any authority to detain Schmuck by giving the State exclusive criminal and civil jurisdiction over Indian reservations including the operation of motor vehicles. The State does not have authority to divest the Tribe of its sovereignty; tribal sovereignty can be divested only by affirmative action of Congress. *See United States v. Wheeler*, 435 U.S. 313, 323, 55 L. Ed. 2d 303, 98 S. Ct. 1079 (1978); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154, 65 L. Ed. 2d 10,

100 S. Ct. 2069 (1980) ("tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States"); *Native Village of Venetie I.R.A. Coun. v. Alaska,* 944 F.2d 548, 558 (9th Cir. 1991). However, RCW 37.12.010 was enacted pursuant to congressional authority in Pub. L. No. 83-280, § 6, 67 Stat. 588 (1953) (hereafter Public Law 280); *State v. Hoffman,* 116 Wn.2d 51, 65-66, 804 P.2d 577 (1991). Because the State statute was enacted under congressional authority, this issue necessarily turns on whether Congress, by enacting Public Law 280, affirmatively divested the Tribe of its power to detain and deliver offenders to governmental authorities for prosecution.

Enacted in 1953, Public Law 280 mandated the transfer of civil and criminal jurisdiction over Indian country from the federal government to five state governments. Pub. L. No. 83-280, § 6, 67 Stat. 588 (1953); *Venetie,* 944 F.2d at 559-60. Other states, including Washington, were permitted to assume such jurisdiction voluntarily. Pub. L. No. 83-280, § 7, 67 Stat. 588 (1953). In 1963, Washington adopted RCW 37.12.010 pursuant to Public Law 280. *Hoffman,* 116 Wn.2d at 65-66. RCW 37.12.010 complies with Public Law 280 and is constitutional. *Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 484, 493, 58 L. Ed. 2d 740, 99 S. Ct. 740 (1979); *Hoffman,* 116 Wn.2d at 65-66.

Although legislative history on the law is sparse, Congress' primary motivation in enacting Public Law 280 was to remedy the lack of adequate criminal law enforcement on some reservations. *Venetie,* 944 F.2d at 560; *Bryan v. Itasca Cy.,* 426 U.S. 373, 379-80, 48 L. Ed. 2d 710, 96 S. Ct. 2102 (1976) (Congress' primary concern was the problem of lawlessness and the absence of adequate tribal law enforcement on certain reservations). Tribes that had a satisfactory tribal law and order organization were exempted from the provisions of Public Law 280. *Bryan,* 426 U.S. at 385.

Both the United States Supreme Court and the Ninth Circuit have concluded that Public Law 280 is not a divestiture statute. *Venetie,* 944 F.2d at 560; *see California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207-12, 94 L. Ed.

2d 244, 107 S. Ct. 1083 (1987); *Bryan*, 426 U.S. at 383-90. In the area of criminal jurisdiction, the Eighth Circuit concluded that Public Law 280 did not itself divest Indian tribes of their sovereign power to punish their members for violations of tribal law: "Nothing in the wording of Public Law 280 or its legislative history precludes concurrent tribal authority". *Walker v. Rushing,* 898 F.2d 672, 675 (8th Cir. 1990). In the area of civil regulatory authority, the United States Supreme Court observed that nothing in the text of Public Law 280 addresses the removal of tribal authority, as would be expected if Congress intended such a "sweeping change in the status of tribal government". *Bryan,* 426 U.S. at 381. The Ninth Circuit has also concluded that Public Law 280 was designed to supplement tribal institutions, not supplant them. *Venetie,* 944 F.2d at 560. Thus, the court held that no provision in either a federal child welfare statute or Public Law 280 prevented concurrent state and tribal jurisdiction. *Venetie,* 944 F.2d at 561. *See also Confederated Tribes of Colville Reservation v. Washington,* 938 F.2d 146, 149 (9th Cir. 1991) (Public Law 280 does not divest a tribe of its right to enact and enforce its own internal civil traffic code against its members), *cert. denied,* ___ U.S. ___, 118 L. Ed. 2d 412, 112 S. Ct. 1704 (1992). The so-called mandatory Public Law 280 states that have addressed the issue consider state and tribal jurisdiction to be concurrent under Public Law 280. *Venetie,* 944 F.2d at 561 (citing 70 Op. Att'y Gen. Wisc. 237, 243 (1981); Opinion No. 48, Opinion Letter from Robert M. Spire, Att'y Gen. Neb., to State Sen. James E. Goll (Mar. 28, 1985)). *See also* F. Cohen, *Federal Indian Law* ch. 6, § C3a(1), at 367 (1982) (Public Law 280 did not extinguish tribal jurisdiction, which probably remains concurrent with the states).

 ██ No court has squarely addressed the issue of whether Public Law 280 divests a tribe's authority to stop and detain non-Indian motorists allegedly violating state and tribal law while traveling on reservation roads. As noted in the above cases, however, nothing in the language or history of Public Law 280 indicates an intent by Congress to diminish tribal

authority. Likewise, nothing in the language of RCW 37.12-.010 affirmatively grants exclusive jurisdiction to the State. *See* RCW 37.12.010. In any event, because RCW 37.12.010 was enacted pursuant to Public Law 280, its scope cannot exceed that authorized by Public Law 280. Given that one of the primary goals of Public Law 280 is to improve law enforcement on reservations, holding that Public Law 280 divested a tribe of its inherent authority to detain and deliver offenders would squarely conflict with that goal.

■ Thus, Public Law 280, by which the State assumed jurisdiction over the operation of motor vehicles on Indian reservations, is at best ambiguous about whether that jurisdiction is exclusive or concurrent with existing tribal authority to stop and detain an alleged offender until he or she can be turned over to government authorities for prosecution. Under the rules of construction for Indian treaties, rights reserved by a tribe in its treaty may be exercised unless and until affirmatively divested by Congress. *See Wheeler*, 435 U.S. at 323; *Venetie*, 944 F.2d at 558. However, congressional intent to override a particular Indian right must be clear; repeal by implication is not favored. *Morton v. Mancari*, 417 U.S. 535, 549-50, 41 L. Ed. 2d 290, 94 S. Ct. 2474 (1974). Where ambiguity exists, ambiguities must be resolved in favor of the Indians. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 85 L. Ed. 2d 753, 105 S. Ct. 2399 (1985).

Accordingly, we hold that RCW 37.12.010, enacted pursuant to Public Law 280, does not divest the Suquamish Indian Tribe of its inherent authority to stop and detain a non-Indian who has allegedly violated state and tribal law while traveling on a public road in the Reservation, until he or she can be turned over to state authorities for charging and prosecution.[8]

---

[8]Our disposition makes it unnecessary for us to address petitioner's other arguments on appeal. To the extent additional arguments are raised by amici, we decline to address them. This court need not consider issues or arguments raised only by an amicus curiae. *State v. Gonzalez*, 110 Wn.2d 738, 752 n.2, 757 P.2d 925 (1988); *Coburn v. Seda*, 101 Wn.2d 270, 279, 677 P.2d 173 (1984).

The judgments of Kitsap County District Court and Kitsap County Superior Court upholding Schmuck's DWI conviction are affirmed.

UTTER, BRACHTENBACH, DURHAM, SMITH, and GUY, JJ., concur.

ANDERSEN, C.J., concurs in the result.