**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

JOSHUA JAMES COOLEY,
*Defendant-Appellee.*

No. 17-30022

D.C. No.
1:16-cr-00042-
SPW-1

ORDER

Filed January 24, 2020

Before: Marsha S. Berzon, Stephanie Dawn Thacker,[*]
and Andrew D. Hurwitz, Circuit Judges.

Order;
Concurrence by Judges Berzon and Hurwitz;
Dissent by Judge Collins

---

[*] The Honorable Stephanie Dawn Thacker, United States Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel filed an order denying a petition for panel rehearing and denying on behalf of the court a petition for rehearing en banc, in a case in which the panel affirmed the district court's order granting a motion to suppress evidence obtained as a result of the defendant's encounter with a Crow Indian Reservation police officer while the defendant's truck was parked on the shoulder of United States Route 212, which is a public right-of-way that crosses the Reservation.

Concurring in the denial of rehearing en banc, Judges Berzon and Hurwitz wrote that even within the questionable genre of dissents from denial of rehearing en banc, Judge Collins's dissent is an outlier that misrepresents the legal context of this case and wildly exaggerates the purported consequences of the panel opinion.

Dissenting from the denial of rehearing en banc, Judge Collins, joined by Judges Bea, Bennett, and Bress, wrote that the panel's extraordinary decision directly contravenes long-established Ninth Circuit and Supreme Court precedent, disregards contrary authority from other state and federal appellate courts, and threatens to seriously undermine the ability of Indian tribes to ensure public safety for the hundreds of thousands of persons who live on reservations within the Ninth Circuit.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**ORDER**

The panel has voted to deny the petition for panel rehearing and petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc.  A judge requested a vote on whether to rehear the matter en banc.  The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed R. App. P. 35.

The petition for rehearing en banc is denied.  Attached are a dissent from and a concurrence respecting the denial of rehearing en banc.

---

BERZON and HURWITZ, Circuit Judges, concurring in the denial of rehearing en banc:

Even within the questionable genre of dissents from denial of rehearing en banc, *see Martin v. City of Boise*, 920 F.3d 584, 588 (9th Cir. 2019) (Berzon, J., concurring in denial of rehearing en banc), Judge Collins's dissent to the denial of rehearing ("dissent") is an outlier. It misrepresents the legal context of this case and wildly exaggerates the purported consequences of the panel opinion.

## I

This case involves an unusual factual scenario and a technical issue of Indian tribal authority. It certainly does not present a "question of exceptional importance" meriting en banc consideration. Fed. R. App. P. 35(a)(2). There is no conflict among the circuits regarding the question presented here, the opinion is not in conflict with a Supreme Court

decision, and the practical implications are limited. The opinion recognizes that tribal officers *can* stop non-Indians on state and federal rights-of-way across Indian reservations long enough to determine whether they are Indians, and also *can* detain them long enough to turn them over to state or federal authorities *if* they were obviously—apparently— violating state or federal law when stopped. So in the case of a speed demon or a drunk driver, Indian authorities can intervene. The issues in this case arise only when a tribal officer, as here, who is not cross-deputized on non-Indian lands, takes it on himself to investigate whether a non-Indian on a federal or state highway right-of-way committed some crime that is not apparent—in other words, a crime that has nothing to do with demonstrated danger on the highway.

## II

Nor does the panel opinion "conflict[] with a decision of the United States Supreme Court." Fed. R. App. P. 35(b)(1)(A). The dissent maintains that the panel opinion missed a whole category of Supreme Court authority for Indian law enforcement officers—Category Two in the dissent's taxonomy. Dissent at 25–27. According to the dissent, that category allows tribal officers to *Terry* stop and investigate non-Indians who are on alienated fee land or federal and state highways that cross Indian reservations. But Category Two does not exist.

As the panel opinion explains, the first basis of authority for tribal officers derives from the inherent power of Indian tribes, as sovereigns, to enforce criminal law against tribal members or nonmember Indians ("Indians") on tribal land. *United States v. Lara*, 541 U.S. 193, 197–200 (2004). Tribes have no criminal jurisdiction over non-Indians, even when they are in Indian country. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195 (1978).

The second source of tribal officers' enforcement authority is tribes' "undisputed power to exclude persons whom they deem to be undesirable from tribal lands." *Duro v. Reina*, 495 U.S. 676, 696 (1990). That power includes the authority of tribal officers to investigate and "eject" non-Indians who "disturb public order on the reservation." *Id.* at 697; *see United States v. Becerra-Garcia*, 397 F.3d 1167, 1175 (9th Cir. 2005) ("Intrinsic in tribal sovereignty is the power to exclude trespassers from the reservation, a power that necessarily entails investigating potential trespassers.").

The Supreme Court has definitively ruled, however, that this power to exclude—and so the authority to investigate non-Indians—does not extend to land within the borders of Indian reservations that is non-Indian, including fee land owned by non-Indians and federal and state highways within reservations. *Strate v. A–1 Contractors* held that "for [non-Indian] governance purposes," state (and federal) rights-of-way are equivalent to "alienated, non-Indian land" and so "[t]ribes cannot assert a landowner's right to occupy and exclude" from such rights-of-way. 520 U.S. 438, 454, 456 (1997).

As this Court summarized in *Bressi v. Ford*, those two sources of authority are the only ones available to tribal officers:

> Unlike the case within most of the reservation, the Nation is not a gate-keeper on a public right of way that crosses the reservation. *See Strate v. A–1 Contractors,* 520 U.S. 438, 455–56 . . . . *The usual tribal power of exclusion of nonmembers does not apply there. See id.*

On the other hand, the state highway is still within the reservation and is part of Indian country. 18 U.S.C. § 1151(a). The tribe therefore has full law enforcement authority over its members and nonmember Indians on that highway. *See United States v. Lara,* 541 U.S. 193, 210 . . . . The tribe accordingly is authorized to stop and arrest Indian violators of tribal law traveling on the highway. *In the absence of some form of state authorization, however, tribal officers have no inherent power to arrest and book non-Indian violators. See Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191 . . . . This limitation has led to obvious practical difficulties. For example, a tribal officer *who observes a vehicle violating tribal law on a state highway* has no way of knowing whether the driver is an Indian or non-Indian. *The solution is to permit the officer to stop the vehicle and to determine first whether or not the driver is an Indian.* In order to permit tribal officers to exercise their legitimate tribal authority, therefore, it has been held not to violate a non-Indian's rights when tribal officers stop him or her long enough to ascertain that he or she is, in fact, not an Indian. *See Schmuck,* 850 P.2d at 1337. *If the violator turns out to be a non-Indian, the tribal officer may detain the violator and deliver him or her to state or federal authorities. Id.; see Strate,* 520 U.S. at 456 n. 11 . . . .

> This rule permitting tribal authority over non-Indians on a public right-of-way is thus a concession to the need for legitimate tribal law enforcement against Indians in Indian country, including the state highways. The amount of intrusion or inconvenience to the non-Indian motorist is relatively minor, and is justified by the tribal law enforcement interest. Ordinarily, there must be some suspicion that a tribal law is being violated, probably by erratic driving or speeding, to cause a stop, and the amount of time it takes to determine that the violator is not an Indian is not great. *If it is apparent that a state or federal law has been violated, the officer may detain the non-Indian for a reasonable time in order to turn him or her over to state or federal authorities. Id.*

575 F.3d 891, 895–96 (9th Cir. 2009) (emphases added). In sum, only "[i]f it is *apparent* that a state or federal law has been violated" may "the [tribal] officer . . . detain the non-Indian for a reasonable time in order to turn him or her over to state or federal authorities." *Id.* at 896 (emphasis added).

No Supreme Court or Ninth Circuit case since *Strate* has divined a third source of tribal authority over criminal activities of non-Indians—the power to *investigate* criminal activity by *non-Indians* on alienated fee land or federal and state rights-of-way. The dissent nonetheless insists that implicit in the limited authority of tribal officers is the power to stop known non-Indians on reasonable suspicion, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and then investigate *whether* any law enforcement violation has occurred. Dissent at 25–27. If that authority existed, then

tribal police could stop, investigate, and detain *known* non-Indians *anywhere* within the boundaries of a reservation for *any* reasonably suspected crime.

In support of this supposed broad authority, the dissent quotes *Duro*'s statement that "[t]ribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary to eject them." Dissent at 26 (quoting *Duro*, 495 U.S. at 697). But *Duro* was explaining the tribal power to exclude, as the preceding sentence indicates. 495 U.S. at 696–97. *Duro*, decided before *Strate*, did not delineate a separate power to detain and investigate non-Indians on alienated non-Indian land within a reservation's boundaries or on federal and state rights-of-way (which were not at issue in *Duro*).

The dissent relies on two other sources for its vehement accusations that the panel ignored its supposed Category Two. The first is a brief and tentative footnote in *Strate*:

> We do not here question the authority of tribal police to patrol roads within a reservation, including rights-of-way made part of a state highway, and to detain and turn over to state officers nonmembers stopped on the highway for conduct violating state law. *Cf. State v. Schmuck*, 121 Wash.2d 373, 390 . . . (en banc) (recognizing that a limited tribal power "to stop and detain alleged offenders in no way confers an *unlimited* authority to regulate the right of the public to travel on the Reservation's roads"), cert. denied, 510 U.S. 931 . . . (1993).

520 U.S. at 456 n.11. This footnote, as *Bressi* explained, at most preserved the right of tribal officers to detain non-

Indians when, in the course of pulling over an unknown offender, the officer identifies the individual as non-Indian but the state or federal legal violation is "apparent." 575 F.3d at 896.

That was not the case here. Cooley was not "stopped on the highway for conduct violating state law." 520 U.S. at 456 n.11. He was not driving when approached by the tribal officer and was not seen "violating state law." Instead, the tribal officer undertook to investigate him for non-apparent, non-traffic-related criminal activity and searched his vehicle. The opinion in this case is entirely consistent with the *Strate* footnote.[1]

The dissent's other key accusation is that the panel opinion disregarded a pre-*Strate* case from this Court, *Ortiz-Barraza v. United States*, 512 F.2d 1176 (9th Cir. 1975). But *Ortiz-Barraza* is plainly no longer good law.

In *Ortiz-Barraza*, a non-Indian was stopped by a tribal officer and detained in the absence of an obvious legal violation. *Ortiz-Barraza* rested squarely on Indian tribes' "power to exclude trespassers from the reservation," *id.* at 1179; *see id.* at 1180—the same power that *Strate* later held does not extend within reservation boundaries to alienated fee land or federal and state rights-of-way, 520 U.S. at 456. Further, *Ortiz-Barraza* concluded that the "[r]ights of way running through a reservation remain part of the reservation and within the territorial jurisdiction of the tribal police."

---

[1] The dissent also points to *Strate*'s citation of *State v. Schmuck*, 121 Wash.2d 373 (1993) (en banc). That *Strate* cites *Schmuck* to emphasize the *limits* of an officer's power to "stop and detain," 520 U.S. at 456 n.11, reinforces our holding that Officer Saylor acted beyond the scope of the Tribe's sovereign authority when he conducted a search of Cooley.

512 F.2d at 1180. *Strate* held directly to the contrary on that point as well. 520 U.S. at 454.

### III

The dissent also maintains that even if Officer Saylor did act beyond his authority in detaining Cooley to investigate whether he was violating some law, "Saylor did *not* act outside his *territorial* jurisdiction," Dissent at 40, so *United States v. Henderson*, 906 F.3d 1109 (9th Cir. 2018), is not, as the panel held, controlling.

Wrong. Because Cooley is not an Indian, the highway was "equivalent, for [non-Indian] governance purposes, to alienated, non-Indian land" when Saylor conducted his investigation and search. *Strate*, 520 U.S. at 454. *Henderson* held that a magistrate judge who "issued a warrant in excess of her jurisdictional authority" violated the Fourth Amendment. 906 F.3d at 1116–17. In imagining some fundamental difference between the magistrate in *Henderson* and the tribal officer here, the dissent once again ignores that *Strate* held state and federal highways within reservations outside the jurisdiction of tribal officials with regard to non-Indians.

Nor is it true that "the problem here (if any)" is that Saylor's "actions were not within the scope of his authority." Dissent at 41. Saylor had no authority to act for the state *at all* because he was not a state actor. *Bressi*, 575 F.3d at 896. That Saylor *could* have been a state actor had he been deputized as one is irrelevant; the Federal Rules of Criminal Procedure *could* have authorized the magistrate in *Henderson* to issue warrants to search computers located outside her district, and they subsequently were amended to do just that. *See* Fed. R. Crim. P. 41(b)(6). Saylor's limited jurisdiction *under federal Indian law* as a tribal officer—not

the unrealized potential for a voluntary agreement between the Crow Tribe and the State of Montana broadening his authority—is what is relevant. For that reason, *Virginia v. Moore*, 553 U.S. 164, 176 (2008), which held that "state restrictions do not alter the Fourth Amendment's protections," has no application here.

## IV

The Supreme Court has in the last few decades prescribed distinct limits on tribal authority over non-Indians even within the geographical boundaries of Indian reservations. It is the dissent, not the panel, that has expanded tribal authority well beyond those limits by "mix[ing] up . . . distinct sources of tribal authority over non-Indians." Dissent at 29.

For the foregoing reasons, we concur in the denial of rehearing en banc.

COLLINS, Circuit Judge, with whom BEA, BENNETT, and BRESS, Circuit Judges, join, dissenting from the denial of rehearing en banc:

The panel's extraordinary decision in this case directly contravenes long-established Ninth Circuit and Supreme Court precedent, disregards contrary authority from other state and federal appellate courts, and threatens to seriously undermine the ability of Indian tribes to ensure public safety for the hundreds of thousands of persons who live on reservations within the Ninth Circuit. I respectfully dissent from our failure to rehear this case en banc.

For more than 40 years, we have held that, when a non-Indian is reasonably suspected of violating state or federal law anywhere within the boundaries of an Indian reservation (including state or federal highways traversing the reservation), tribal police officers have the authority to conduct on-the-spot investigations of the sort authorized under *Terry v. Ohio*, 392 U.S. 1 (1968). *See Ortiz-Barraza v. United States*, 512 F.2d 1176, 1180–81 (9th Cir. 1975). Under this well-settled law, the tribe's conceded lack of criminal jurisdiction over such non-Indians, *see Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), does *not* deprive the tribe of the authority to conduct *Terry*-style investigations of non-Indians and, if probable cause arises, to then turn the non-Indian suspect over to the appropriate state or federal authorities for criminal prosecution. *Ortiz-Barraza*, 512 F.2d at 1180–81. Over the intervening years, numerous courts have expressly endorsed *Ortiz-Barraza*'s conclusion that tribes may detain and investigate non-Indians for suspected violations of state and federal law, correctly recognizing that "the power to maintain public order by investigating violations of state law on the reservation . . . is clearly an incident of general tribal sovereignty." *State v. Pamperien*, 967 P.2d 503, 505 (Or. Ct. App. 1998); *see also United States v. Terry*, 400 F.3d 575, 579–80 (8th Cir. 2005); *State v. Schmuck*, 850 P.2d 1332, 1340–42 (Wash. 1993); *State v. Haskins*, 887 P.2d 1189, 1195–96 (Mont. 1994).

Without even so much as a mention of our controlling decision in *Ortiz-Barraza*, the panel in this case sweeps away four decades of settled law and instead announces that Indian tribes now "*lack* the ancillary power to investigate non-Indians" for reasonably suspected violations of state or federal law that occur on state or federal highways, or on non-Indian fee lands, within the reservation. *United States*

*v. Cooley*, 919 F.3d 1135, 1141 (9th Cir. 2019) (emphasis added).  According to the panel, tribal officers' previously straightforward authority to stop any driver, Indian or non-Indian, based on the familiar reasonable suspicion standard, *see Heien v. North Carolina*, 574 U.S. 54, 60 (2014), has now been replaced by the following convoluted series of rules that turn on what the officer does or does not know about the driver's tribal status:

- A tribal officer *only* has the authority to "stop those suspected of violating *tribal* law on public rights-of-way"—*not* state or federal law—and even then only "as long as the suspect's Indian status is *unknown*" (or is known to be Indian).  *Cooley*, 919 F.3d at 1142 (emphasis added).

- Once a tribal officer has stopped a driver whose status is unknown, the officer's "initial authority is limited to ascertaining whether the person is an Indian." *Id.*

- If, in the course of the "limited interaction" necessary to determine that the driver is a non-Indian, the officer happens to discover an "'obvious' or 'apparent' violation[] of state or federal law," he or she may continue to detain that person until the appropriate state or federal officials can take custody. *Id.* (citation omitted).  This limited detention authority, however, "does *not* allow officers to search a known non-Indian for the purpose of finding evidence of a crime." *Id.* (emphasis added).

- But if the non-Indian has not committed an "obvious" violation of state or federal law, then the officer may not detain the person further, conduct

*any* investigation of the non-Indian, or conduct any searches. *Id*. at 1142–43.

- If the officer nonetheless persists, then the officer is acting outside his or her jurisdiction, and the officer's conduct is presumptively unreasonable under Fourth Amendment principles. *Id*. at 1145–46.[1] The officer, however, may still exercise the very limited authority that a private citizen would have had "under the common law of the founding era." *Id*. at 1146. That authority is limited to seizing a violator whom the officer has "personally observed" commit a "*felony*," and does not include *any* authority to conduct searches. *Id*. at 1146–47 & n.9 (emphasis added).

- Likewise, if *before* any stop is made, the tribal officer *already knows* that the suspected violator is a non-Indian, the officer's power is limited to the citizen's-arrest authority of seizing those whom the officer personally observed commit a felony. *Id*. at 1142, 1146.

By allowing tribal officers to detain non-Indians only for "obvious" violations of state or federal law or for felonies committed in the officer's presence, the net effect of the panel's remarkable decision is to replace the easily administered reasonable suspicion standard that has applied for decades under *Ortiz-Barraza* with a novel and complex

---

[1] Although the Fourth Amendment does not apply directly to Indian tribes, *see Duro v. Reina*, 495 U.S. 676, 693 (1990), Congress has subjected tribes to Fourth Amendment standards by statute under the Indian Civil Rights Act (ICRA). *See* 25 U.S.C. § 1302(a)(2).

set of standards, all of which are *more demanding than ordinary probable cause*.

Judge Berzon's and Judge Hurwitz's concurrence in the denial of rehearing en banc belatedly attempts to defend the panel's stealth overruling of *Ortiz-Barraza* by contending that our holding in that case was abrogated by the U.S. Supreme Court's intervening decision in *Strate v. A–1 Contractors*, 520 U.S. 438 (1997). *See* Concurrence at 9–10. That is demonstrably wrong. Far from undermining *Ortiz-Barraza*, *Strate* reaffirms its continued validity by expressly endorsing the authority of tribal officers to conduct traffic stops of "*nonmembers*" for "conduct violating *state* law," and to do so on all "roads within a reservation, including rights-of-way made part of a state highway." 520 U.S. at 456 n.11 (emphasis added). Indeed, as support for this conclusion, the U.S. Supreme Court quoted the Washington Supreme Court's express endorsement of such "limited tribal power 'to stop and detain alleged offenders'" in *Schmuck*, *see Strate*, 520 U.S. at 456 n.11 (quoting *Schmuck*, 850 P.2d at 1341), and on that very same cited page, *Schmuck* in turn explicitly based its recognition of that authority on our decision in *Ortiz-Barraza*. *See* 850 P.2d at 1341 ("We agree with the Ninth Circuit."). At a minimum, *Ortiz-Barraza* is easily reconciled with *Strate*, and the panel therefore wholly lacked authority to flout that controlling Ninth Circuit precedent. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (three-judge panel may disregard prior precedent only when it is "clearly irreconcilable" with intervening Supreme Court or en banc authority).

The panel's decision in this case is plagued by a further critical legal error that independently warrants en banc review. Having concluded that the tribal officer in this case

acted outside the scope of what, "under the law of the founding era, a private citizen could lawfully" have done, the panel suppressed the evidence "obtained as a result" of that encounter.   919 F.3d at 1140, 1148.**²**   But the panel's limitation of tribal officer authority to that of founding-era private citizens rests on an erroneous analogy to searches and seizures conducted outside of an officer's *geographic* jurisdiction.  Even if one assumes *arguendo* that the panel is correct in concluding that tribal officers who have not been cross-deputized under state law may not conduct *Terry*-style inquiries of non-Indians on state or federal highways *within* the reservation, the proper analogy would be to a law enforcement officer who lacks *state-law authority* to take particular actions *within* his or her territorial jurisdiction. The law is settled, however, that such deficiencies in state-law authorization are irrelevant to the Fourth Amendment evaluation of the reasonableness of a search or seizure.  *See*, *e.g.*, *Virginia v. Moore*, 553 U.S. 164, 171–76 (2008); *Martinez-Medina v. Holder*, 673 F.3d 1029, 1037 (9th Cir. 2011); *Saunders v. Silva*, 473 Fed. App'x 769, 770 (9th Cir. 2012); *see also Johnson v. Phillips*, 664 F.3d 232, 238 (8th Cir. 2011).

Moreover, the panel's deeply flawed decision involves questions of extraordinary practical importance that merit en banc review.  Although the concurrence claims that this case involves a "technical issue of Indian tribal authority" whose "practical implications are limited," *see* Concurrence at 3–4, nothing could be further from the truth.  The elimination of

---

**²** This, in turn, involved the further novel holding that violations of ICRA warrant the remedy of suppression to the same extent as a Fourth Amendment violation.  *See* 919 F.3d at 1143–45.  The Government, however, conceded this issue in its opening brief, and it has not raised that issue in its petition for rehearing.

tribal *Terry*-stop authority with respect to non-Indians on fee lands and public highways—which the panel replaces with standards that are higher than probable cause—is a very big deal, because it threatens to have a dramatic effect on public safety within the many Indian reservations in this circuit. Although reservations vary widely, there are some in which a large percentage of the reservation's land area is non-Indian fee land, and some that have very significant numbers of non-Indian residents.  The panel thus strips tribes of a critical element of their sovereign authority to maintain public order with respect to what, in some cases, will be a significant portion of the people or land within the reservation.  The concurrence may be right that the "practical limitations" of the panel decision are "limited" for those of us who do not live on Indian reservations, but for the hundreds of thousands who do, it makes a great deal of difference if tribal law enforcement lacks on-the-spot authority to detain and investigate non-Indians based on the familiar reasonable suspicion standard.  If Supreme Court precedent truly required that we blow such a gaping hole in tribal law enforcement, then we would be obligated, as an "inferior Court[]," to do so.  *See* U.S. Const., art. III, § 1. But nothing in *Strate* requires the panel's troubling disregard of sovereign tribal authority.  On the contrary, adherence to Supreme Court and Ninth Circuit precedent forbids what the panel has done here.

I respectfully dissent from our refusal to rehear this case en banc.

# I

## A

Around 1:00 AM on February 26, 2016, after completing his shift, Crow Tribal highway safety officer James Saylor

was driving eastbound along U.S. Highway 212, a federal right-of-way on the Crow Indian Reservation in southern Montana.[3] Saylor passed a white Dodge pickup truck parked on the westbound shoulder of the highway with its headlights on, and since that area was known to him as "a very dangerous stretch of road," Saylor decided to go back and conduct a "welfare" check. In pulling up behind the Dodge, Saylor intentionally did not activate his overhead lights because he "didn't want the occupants of the vehicle to feel as though [he] was detaining them."

As he approached the vehicle, Saylor heard that the Dodge's engine was running and saw that it had Wyoming license plates. He also noticed that the pickup truck had "a lot of stuff in the bed of the truck," which was filled almost to the "bed rails with different items." The passenger compartment had dark windows, and it also "appeared to be lifted with some kind of lift or leveling kit" and had "oversized tires." Saylor knocked on the side of the truck, and the rear driver-side window briefly rolled down and then rolled back up. Saylor "expected the front driver's side window to roll down after that, as if maybe somebody had hit the wrong button," but it did not. During the brief period the rear window was down, Saylor thought he saw a small child "crawling around in the back."

Saylor shined his flashlight through the tinted front driver-side window, and he saw a man (Cooley) who then gave him what appeared to be a thumbs-down sign. Saylor "didn't know what he was trying to convey, if his window wouldn't go down, or if he wasn't okay." Saylor asked Cooley if he could get his window down, and Cooley

---

[3] This summary is based primarily on the testimony of Officer Saylor at the suppression hearing. *See Cooley*, 919 F.3d at 1139 n.1.

lowered it about 4–6 inches.  Saylor could see that Cooley "had watery, bloodshot eyes," and that he "appeared to be non-native."  Saylor also saw a toddler (who turned out to be Cooley's son) crawl from the back seat onto Cooley's lap.  Saylor asked if everything was OK, and Cooley responded that he had pulled over because he was tired.  That was not uncommon in Saylor's experience, although it also was not "uncommon to come across a motorist that is impaired and has pulled over because of that impairment."  Not having excluded the latter possibility, Saylor decided that "as long as [Cooley] was willing to talk with me, I was willing to talk with him to make sure of the welfare of him and the child."

Saylor asked where Cooley had driven from, expecting that he might have stopped after a long drive.  Cooley responded, however, that he had driven from Lame Deer, which Saylor knew to be a town that was less than half an hour away in the adjacent Northern Cheyenne Indian Reservation.  (Saylor had previously served as a Bureau of Indian Affairs (BIA) police officer on that reservation for several years.)  Saylor asked, "what he was up to in Lame Deer," and Cooley responded that he had gone there to buy a vehicle from someone named "Thomas," either "Thomas Spang" or "Thomas Shoulder Blade."  Saylor recognized both names—Thomas Spang had been involved in drug trafficking and Thomas Shoulder Blade had been a BIA employee.

Saylor thought it was odd that Cooley had been attempting to purchase a vehicle so late at night, and he also thought it was odd that Cooley did not have another adult with him.  As Saylor explained at the suppression hearing, when buying a car, "I've always had another passenger with me to drive my new purchase, especially if I'm going in a vehicle that I already own, unless I'm trading it in."  Saylor

questioned Cooley further, and Cooley responded that the vehicle he was supposed to buy "had broken down and that Thomas had allowed him to use the vehicle that he was in." This response puzzled Saylor even more, because he "didn't understand why somebody would allow the use of a vehicle with all the personal belongings that [he had] seen in the bed." He also did not understand why Thomas Spang or Thomas Shoulder Blade would have a vehicle registered in Wyoming; in his experience, most Northern Cheyenne members either had "a Northern Cheyenne license plate through the State of Montana, or they wouldn't have any registration at all."

Saylor was having a hard time understanding Cooley, because the engine was running and because Cooley "was even sounding as though he had some slurred words." Saylor asked Cooley to lower the window so that he could hear better, and Cooley did so. At that point, Saylor saw what appeared to be "two semiautomatic rifles" on the front passenger seat. Having weapons in a vehicle was not uncommon in Montana, in Saylor's experience, but he was further puzzled when Cooley said that the guns belonged to Thomas. As Saylor explained at the hearing, "I have never known an instance . . . where somebody has lent somebody else their vehicle with all of their property to include firearms."

At this point, Saylor asked Cooley for his ID. In response, Cooley did not retrieve his ID, but instead began pulling out of his pocket "small denomination bills" and putting them in a compartment in the console area. The third or fourth time Cooley reached for his pocket, Saylor "noticed a change in his demeanor." Rather than glance in Saylor's direction, as he had done on the other instances, Cooley "started staring straight forward out of the windshield of his

truck, as if he was looking through his son" on his lap. Cooley's "breathing really became shallow and rapid, and he had a moment where he just wasn't doing anything, wasn't moving." As someone who taught other officers as a "use-of-force instructor," Saylor thought this seemed like what is sometimes called a "thousand-yard stare," which can be a sign of an imminent assault. At that point, Saylor drew his weapon, but did not point it at Cooley. Saylor ordered him to keep his hands visible and to slowly retrieve his ID "and only his ID." Cooley then produced a Wyoming driver's license. Saylor tried to call in the license on the spot with his hand-held radio, but he could not get a signal. Although Saylor thought the radio in his patrol car would work, he concluded that for safety reasons he could not simply go back to his vehicle.

Instead, Saylor went around the back of the Dodge to the passenger side, so that he would have some ability to shield himself if the encounter turned violent. Saylor then opened the passenger door and confirmed that no one else was in the vehicle. Saylor saw that, "in the area where [Cooley] had been reaching his hand" earlier, there was a loaded semiautomatic pistol. Saylor asked why Cooley had not mentioned the pistol, and Cooley said that he had not known it was there. Saylor reached for the pistol and disarmed it, and he could see that the rifles were unloaded.

Saylor testified that, at a minimum, he wanted to run the driver's license at his patrol car, and so he ordered Cooley out of the truck. After patting down Cooley, Saylor moved to place Cooley and his son in the patrol unit. Cooley asked if he could first empty his pockets, and in addition to bills, Cooley removed small Ziploc bags that Saylor thought were commonly used "for the packaging and sale of narcotics, specifically, in [his] experience, methamphetamines."

Recalling that at some point in their conversation Cooley had vaguely mentioned that somebody might be coming to meet him at the side of the road, Saylor decided to radio for backup and to secure the scene before running a records check. Saylor retrieved the rifles and pistol from the Dodge, turned off the ignition, and took the keys. In leaning to reach the keys, he noticed "glass, smoking pipe and [a] plastic baggie containing what appeared to be methamphetamine." Other officers soon arrived, including a county deputy. A subsequent search of the vehicle disclosed more than 50 grams of methamphetamine.

## B

Cooley was indicted in the district court on drug-trafficking and firearms charges, and he moved to suppress evidence from his encounter with Saylor. The district court conducted a hearing and granted Cooley's motion to suppress.

The Government appealed and the panel affirmed. *See Cooley*, 919 F.3d 1135. The panel held that, because tribes lack the authority to exclude non-Indians from state or federal highways that run through a reservation, tribes "lack the ancillary power to investigate non-Indians who are using such public rights-of-way." *Id*. at 1141. According to the panel, a tribe may stop anyone suspected of violating *tribal* law on public rights-of-way "as long as the suspect's Indian status is unknown." *Id*. at 1142. Once a suspected violator is stopped, the officer "will typically need 'to ask one question' to determine whether the suspect is an Indian." *Id*. (citation omitted). If the suspect turns out to be a non-Indian, then (according to the panel) the tribal officer may conduct no further investigation, and the officer may continue to detain the non-Indian only if it is then "obvious" or "apparent" that the non-Indian has committed a state or

federal crime. *Id*. at 1142, 1147–48. In that circumstance, the panel stated, the non-Indian may be detained long enough to turn him or her over to the appropriate state or federal authorities. *Id*. at 1142. If the officer persists in the absence of an obvious violation, then the tribal officer's actions are presumptively unreasonable under Fourth Amendment principles, as made applicable under ICRA. *Id*. at 1145–46. The only exception would be that the officer could still exercise the citizen's-arrest authority of a private citizen under the "common law of the founding era." *Id*. at 1146. That, according to the panel, limits the officer to arresting for *felonies* committed in the officer's presence and forbids the officer from conducting any searches. *Id*. at 1146–47 & n.9.

Because Saylor's actions clearly exceeded the panel's narrow conception of tribal police authority, the panel held that Saylor violated the Fourth Amendment principles made applicable to tribes under ICRA. *Id*. at 1148. The panel therefore affirmed the order granting Cooley's motion to suppress.

## II

To set the panel's analysis in context, and to make the panel's errors more apparent, it helps first to summarize the various sources of tribal authority over non-Indians within the boundaries of a reservation.

## A

"Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987). That authority, however, is subject to significant limitations. Chief among these is the settled rule that "Indian tribal

courts" may not exercise "*criminal* jurisdiction over non-Indians." *Oliphant*, 435 U.S. at 195 (emphasis added). Thus, even with respect to conduct by non-Indians within the reservation, a tribe may neither apply its substantive criminal law to non-Indians nor try a criminal charge against a non-Indian.

As to a tribe's *civil* jurisdiction, the tribe's authority depends upon whether the non-Indian's conduct occurred "on tribal land" within the reservation or on land that, while still within the reservation, has been "alienated" in fee simple to a non-Indian. *Strate*, 520 U.S. at 454. Tribes "retain considerable control over nonmember conduct *on tribal land*," *id*. (emphasis added), but "the civil authority of Indian tribes and their courts with respect to *non-Indian fee lands*" only extends to non-Indians in the two situations set forth in *Montana v. United States*, 450 U.S. 544 (1981). *See Strate*, 520 U.S. at 453 (emphasis added). A state highway running through a reservation is considered, for jurisdictional purposes, to be equivalent to reservation "land alienated to non-Indians." *Id*. at 456.

Under the first *Montana* exception, a tribe may exercise regulatory and adjudicatory jurisdiction over "'activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.'" *Id*. at 446 (quoting *Montana*, 450 U.S. at 565). "The second exception to *Montana*'s general rule [of no civil jurisdiction over non-Indians on non-Indian fee lands] concerns conduct that 'threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.'" *Id*. at 457 (quoting *Montana*, 450 U.S. at 566). To fall within this second exception, regulatory or adjudicatory jurisdiction must be "'necessary to protect tribal self-government'" or

"crucial to 'the political integrity, the economic security, or the health or welfare'" of the tribe. *Id*. at 459 (quoting *Montana*, 450 U.S. at 564, 566).

## B

Against this general framework of tribal authority over non-Indians, the case law recognizes three distinct sources of tribal authority to *investigate and detain* non-Indians within the boundaries of a reservation.

## 1

*First*, tribes retain, *on tribal land*, "a landowner's right to occupy and exclude" non-Indians entirely, *see Strate*, 520 U.S. at 456, and this "power to exclude trespassers from the reservation . . . necessarily entails *investigating* potential trespassers." *United States v. Becerra-Garcia*, 397 F.3d 1167, 1175 (9th Cir. 2005) (emphasis added). Once identified, such trespassers can be detained for the limited amount of time necessary to expel them from the reservation.

## 2

*Second*, a tribe's sovereignty includes an additional, more limited power of expulsion that extends even to non-Indians on alienated fee lands. The fact that tribes lack criminal jurisdiction to try non-Indians does *not* mean that they must stand idly by and let non-Indians "violate the law with impunity" within the reservation. *Duro v. Reina*, 495 U.S. at 696. On the contrary, a tribe's sovereignty includes the authority to restrain criminal conduct within the reservation and to detain violators so that they may be prosecuted by those who *do* have criminal jurisdiction over them:

> Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them. Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities.

*Id.* at 697. This more limited power to eject lawbreakers does *not* rest on the general landowner-based power of exclusion from *tribal* lands, because it expressly extends to "land alienated to non-Indians," including "rights-of-way made part of a state highway." *Strate*, 520 U.S. at 456 & n.11.

Moreover, this "power of the [tribe] to exclude non-Indian *state and federal law violators* from the reservation would be meaningless were the tribal police not empowered to *investigate* such violations," and so "[o]bviously, tribal police must have such power." *Ortiz-Barraza*, 512 F.2d at 1180 (emphasis added). This power to investigate, in turn, embraces the power to temporarily detain a non-Indian based on reasonable suspicion, and to conduct the sort of limited on-the-spot investigation permitted by *Terry v. Ohio*, 392 U.S. at 30. *See also United States v. Terry*, 400 F.3d at 579–80 (holding that "tribal police officers do not lack authority to detain non-Indians whose conduct disturbs the public order on their reservation" and that "[a]t the time that the tribal officers stopped Mr. Terry they clearly had a reasonable and articulable suspicion that 'criminal activity may be afoot'") (quoting *Terry v. Ohio*, 392 U.S. at 30); *Pamperien*, 967 P.2d at 506 & n.4 ("tribal law enforcement officers have the authority to investigate on-reservation violations of state and federal law as part of the tribe's

inherent power as sovereign," and this power extends to non-Indians "stopped on a state highway"); *Haskins*, 887 P.2d at 1195 (tribe's power "to restrain non-Indians who commit offenses within the exterior boundaries of the reservation and to eject them by turning such offenders over to the proper authority" includes the ancillary "authority to *investigate* violations of state and federal law") (emphasis added) (citing *Ortiz-Barraza*, 512 F.2d at 1180); *Schmuck*, 850 P.2d at 1341 ("[T]he Tribe's authority to stop and detain is not necessarily based exclusively on the power to exclude non-Indians from tribal lands, but may also be derived from the Tribe's general authority as sovereign.") (emphasis omitted).

In *Ortiz-Barraza*, a tribal police officer on a reservation adjoining the border with Mexico developed a reasonable suspicion that a pickup truck had crossed the international border and might be engaged in "smuggling of contraband." 512 F.2d at 1180–81. The officer followed the vehicle onto the state highway that ran through the reservation, and he approached the vehicle, which had stopped, to briefly investigate his suspicions. *Id*. at 1178. During the ensuing encounter, the officer frisked Ortiz-Barraza, searched his vehicle, and discovered marijuana. *See id.* at 1178–79. We held that the officer had the authority to conduct this investigation of a non-Indian based on reasonable suspicion, and we specifically rejected the argument that a different conclusion was warranted because the encounter had taken place on a state highway. *Id*. at 1180; *see also Pamperien*, 967 P.2d at 505–06 & n.4; *Schmuck*, 850 P.2d at 1340–41.

## 3

*Third*, we have recognized an additional category of extremely limited investigatory power over non-Indians that is purely ancillary to the tribe's authority to apply *tribal* law

to *tribal* members.  In *Bressi v. Ford*, 575 F.3d 891 (9th Cir. 2009), a tribal police department erected a roadblock across a state highway within the reservation in order to "check for sobriety, drivers' licenses, registration, and possession of alcohol."  *Id*. at 894.  Because the roadblock was on a state highway, which is considered to be equivalent to alienated non-Indian fee land, the tribal officers' detention and investigation of all drivers, including non-Indians, could *not* be justified under the general power to exclude non-Indians from tribal lands.  *Id*. at 895–96.  And because the roadblock was "*suspicionless*," and "*[a]ll* vehicles are stopped," *id*. at 896 (emphasis altered), the detention and investigation of all drivers, including non-Indians, could *not* be justified as an exercise either of "the power to restrain those who disturb public order on the reservation," *Duro*, 495 U.S. at 697, or the "power . . . to exclude non-Indian *state and federal law violators* from the reservation," *Ortiz-Barraza*, 512 F.2d at 1180 (emphasis added).

Nonetheless, we stated that an across-the-board roadblock could be upheld as being purely ancillary to the tribe's "full law enforcement authority over *its members and nonmember Indians* on that highway."  *Bressi*, 575 F.3d at 896 (emphasis added).  Because, however, the tribe's power to enforce tribal law against tribal members does *not* extend to non-Indians, a roadblock "established on tribal authority" would be "permissible only to the extent that the suspicionless stop of non-Indians is limited to the amount of time, and the nature of inquiry, that can establish whether or not they are Indians."  *Id*. at 896–97.  Consequently, when a detention is based *solely* on such "purely tribal authority," only "apparent" or "obvious violations" of law may prolong the detention of a non-Indian, and *any* "inquiry going beyond Indian or non-Indian status, or including searches for evidence of crime, are [sic] *not* authorized" in the "case of

non-Indians." *Id*. Because, in *Bressi*, the tribal officers "did not confine themselves to inquiring whether [Bressi] was or was not an Indian," their actions fell outside the scope of their authority as tribal officers. *Id*. at 897.[4]

## III

The panel's decision here mixed up these distinct sources of tribal authority over non-Indians and thereby erroneously held that the second power described above—the power to detain and investigate *reasonably suspected* non-Indian violators of state and federal law—does not exist. Because *Ortiz-Barraza* squarely holds to the contrary, the panel's opinion can *only* be correct if *Ortiz-Barraza* is "clearly irreconcilable" with intervening Supreme Court authority. *Miller v. Gammie*, 335 F.3d at 900. That "high standard" is not met here. *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011). Although the panel did not mention *Ortiz-Barraza* at all, the concurrence now asserts that *Ortiz-Barraza* has been overruled by the Supreme Court's decision in *Strate*. *See* Concurrence at 9–10. That is plainly incorrect.

---

[4] In *Bressi*, the tribal officers also happened to have been empowered under Arizona law to enforce *state* law within the reservation. 575 F.3d at 894. Accordingly, the specific holding of *Bressi* was that, because the roadblock could not be characterized as "purely a tribal endeavor," the officers' conduct of the roadblock took place under color of *state* law and therefore subjected them to suit under § 1983 to the extent that the roadblock did not comply with Fourth Amendment standards. *Id*. at 894, 897; *see also id*. at 895 (noting that § 1983 would not have applied to the tribal officers in that case if they had been acting under color of tribal law).

**A**

The panel's confused analysis jumbles together these various distinct tribal powers and ends up generating a convoluted set of rules that will prove difficult for tribal officers to administer and that will leave significant gaps in their practical ability to ensure public safety on Indian reservations.

The panel's critical mistake was that it held that a tribe's power to investigate potential crimes by non-Indians rests solely on the *general* tribal power to exclude non-Indians from *tribal* lands, *i.e.*, the first power described above. *Cooley*, 919 F.3d at 1141; *see also* Concurrence at 9–10. Because *Strate* holds that a tribe lacks such a general power of exclusion with respect to a "state or federal highway" on a right-of-way through the reservation, the panel reasoned, "[t]ribes also lack the ancillary power to investigate non-Indians who are using such public rights-of-way." *Cooley*, 919 F.3d at 1141. But as explained below, *Strate* coupled its holding that state highways are equivalent to fee lands with an express reaffirmation of the power of tribal officers to conduct traffic stops of non-Indians for violations of state law. *See infra* at 34–35. That is, *Strate* expressly reaffirmed the second power described above and recognized in *Ortiz-Barraza*.

Having already crossed wires between the first two distinct tribal powers discussed above, the panel then crossed wires with the third power as well, by further claiming that the tribe's authority to enforce substantive *tribal* law against *tribal* members (the distinct power discussed in *Bressi*) is the sole source for a tribal officer's authority over non-Indians suspected of violating *state or federal* law on public highways. *Cooley*, 919 F.3d at 1142; *see also* Concurrence at 8–9. According to the panel, a tribal

officer may only conduct stops for suspected violations of "*tribal* law," but since the tribal status of most violators will not be known until the driver is pulled over, the officer may stop *any* driver "as long as the suspect's Indian status is unknown." *Cooley*, 919 F.3d at 1142 (emphasis added); *see also* Concurrence at 8–9. When a tribal officer thus stops a person *without* knowing whether he or she is an Indian, the officer's "initial authority is limited to ascertaining whether the person is an Indian," and if the person is not, then the officer lacks any investigative authority and can only continue to detain the non-Indian if it is "'*apparent*' or '*obvious*' that state or federal law is being or has been violated." *Cooley*, 919 F.3d at 1142 (emphasis added) (quoting *Bressi*, 575 F.3d at 896–97). Thus, if a tribal officer pulls over a vehicle based merely upon *reasonable suspicion* of drunk driving, then once the officer has determined that the driver is not an Indian, the officer may conduct *no* investigation to dispel the suspicion or to ripen it into probable cause—no questions, no breathalyzer, no walking in line, etc. *See* Concurrence at 4 (if a suspected drunk driver turns out to be a non-Indian, the driver may be detained only if he or she was "obviously—apparently—violating state of federal law *when stopped*") (emphasis added).

As noted above, the panel held that this *Bressi* power to detain suspected *tribal* law violators exists only "as long as the suspect's Indian status is *unknown*." *Cooley*, 919 F.3d at 1142 (emphasis added); *see also* Concurrence at 8–9. In the panel's view, when a tribal officer proceeds to detain and investigate a person that he or she *knows* to be a non-Indian, the tribal officer's actions are analogous to those of an officer acting outside of his or her *geographic* jurisdiction. *Cooley*, 919 F.3d at 1145–48. Because the "common law of the founding era often deemed searches and seizures unreasonable when police officers acted outside the bounds

of their sovereign's jurisdiction," the panel reasoned, such an extra-jurisdictional search or seizure would violate Fourth Amendment principles (made applicable to Indian tribes by ICRA, 25 U.S.C. § 1302(a)(2)) unless the officer's actions fall within the citizen's-arrest authority of private citizens under the "common law of the founding era." *Id*. at 1146. Under those common law principles, the panel held, a tribal officer in such circumstances could only detain a non-Indian whom the officer has "personally observed" to have committed a "*felony*." *Id*. (emphasis added). Although the panel suggests that this citizen's-arrest power to stop and detain *known* non-Indians "roughly comports with" the *Bressi* power to *continue* to detain those who, *after* being stopped, are discovered to be non-Indians who have committed an "obvious" state or federal law violation, *id*. at 1147, that suggestion is wrong. Given that, according to the panel, the citizen's-arrest power to stop and detain a *known* non-Indian extends only to *felonies*, it will not extend to a wide array of serious and dangerous traffic offenses that are only misdemeanors. Because, for example, a first-time DUI in Montana is generally only a misdemeanor punishable by not "more than 6 months" in prison, *see* Mont. Code Ann. § 61-8-714(1)(a), the panel's reasoning presumably means that a tribal officer cannot *stop* a drunk driver on a state highway if the officer *knows* the driver is a non-Indian.

Moreover, by holding that a tribal officer's on-the-spot authority thus differs dramatically depending upon the officer's knowledge of Indian status (both before a stop, as well as after a stop), the panel's decision creates a further practical problem by placing enormous weight on a factor that will often be ill-suited for such on-the-spot resolution. Because the panel does *not* allow a tribal officer to rely on a "person's physical appearance," officers will likely have to "rely on a detainee's response when asked about Indian

status." 919 F.3d at 1142–43. The incentive to lie, of course, will be significant, and because (according to the panel) there is no authority to investigate or search a non-Indian, the officer presumably cannot search (for example) for a tribal identification card (if the person happens to have one). And even if the person claims to be an Indian, the panel ominously suggests that the officer may not be in the clear even then: the panel expressly reserves the question of what authority a tribal officer has when he or she "asks whether the individual is an Indian and is told, incorrectly, that he is." *Id*. at 1147 n.10.

Considering all of these practical difficulties and issues raised by the panel's opinion here, I am reminded of Justice Scalia's remark: "There are many questions here, and the answers to all of them are ridiculous." *Grady v. Corbin*, 495 U.S. 508, 542 (1990) (Scalia, J., dissenting). But all of these intractable practical issues evaporate if we adhere—as we must—to our decision in *Ortiz-Barraza*, because it correctly holds that a tribal officer has the on-the-spot power to briefly detain and investigate a reasonably suspected lawbreaker *regardless* of whether he or she is known to be a non-Indian. Under *Ortiz-Barraza*, issues over tribal status only affect who ultimately can *charge and prosecute* the person and not the *Terry v. Ohio* authority to temporarily detain and investigate the person. If a detainee's tribal status cannot be satisfactorily resolved on the spot, the officer can nonetheless continue with the *Terry* investigation and, if the officer's reasonable suspicion ripens into probable cause, the tribal status of the *arrestee* can then be sorted out as soon as practicable (at the stationhouse, if necessary).

Of course, if the Supreme Court in *Strate* truly foisted upon us the byzantine regime described in the panel's opinion, then we are bound to implement it, regardless of

what *Ortiz-Barraza* held.    But Cooley's suggestion that *Strate* overruled *Ortiz-Barraza* does not survive even casual scrutiny.    On the contrary, *Strate* reinforces the correctness of *Ortiz-Barraza*.

## B

Three observations about *Strate* suffice to make clear that the panel's rejection of tribal investigative authority over non-Indians on state and federal highways is wrong.

## 1

*First*, *Strate* itself refutes the panel's assumptions that (1) an across-the-board tribal power to conduct *Terry*-style investigations of non-Indians for violations of state or federal law can *only* rest on the general power to exclude non-Indians from *tribal lands*, and (2) any such power is therefore inapplicable to state or federal highways within reservations.    After concluding that a state highway running through a reservation is more akin to alienated, non-Indian land than to tribal land, the *Strate* Court immediately added the following observation in a footnote:

> We do not here question the authority of tribal police to patrol roads within a reservation, including rights-of-way made part of a state highway, and to detain and turn over to state officers nonmembers stopped on the highway for conduct violating state law. Cf. State v. Schmuck, 121 Wash. 2d 373, 390, 850 P.2d 1332, 1341 (en banc) (recognizing that a limited tribal power "to stop and detain alleged offenders in no way confers an unlimited authority to regulate the right of the

> public to travel on the Reservation's roads"),
> cert. denied, 510 U.S. 931 (1993).

*Strate*, 520 U.S. at 456 n.11 (emphasis added). The power thus expressly reaffirmed by the Supreme Court—namely, a tribal officer's affirmative power to "stop[]" a "nonmember" on a state "highway for conduct violating state law"—cannot have been based on the general power to exclude from *tribal lands* (the first power described above), because the highway is not considered to be equivalent to tribal lands, but rather to reservation land that has been alienated to non-Indians. *Id*. at 456. Nor does it rest on the authority to enforce *tribal law* against tribal members (the third power described above, which was addressed in *Bressi*), because the Court explicitly described it as a power to conduct traffic "*stop[s]*" of "*nonmembers*" for violations of "*state* law." *Id*. at 456 n.11 (emphasis added).[5] This is precisely the *additional* category of authority recognized in *Ortiz-Barraza*, and it is expressly affirmed by the Supreme Court in *Strate*.

**2**

*Second*, the Court's explicit recognition that tribal officers may conduct *traffic stops* of non-Indians for violations of state law on state highways within reservations can only be understood against the familiar backdrop of the settled law governing such stops. The predicate necessary to conduct a traffic stop and to temporarily detain the driver

---

[5] The concurrence is therefore wrong in positing that the power reaffirmed in *Strate* is the one recognized in *Bressi* rather than the one addressed in *Ortiz-Barraza*. *See* Concurrence at 8–9. Nothing in *Strate*'s straightforward and express recognition of tribal traffic stop authority over non-Indians for violations of state law can be said to adopt the bizarre and complex collection of rules that the panel purports to derive from the very limited *Bressi* power. *See supra* at 12–14.

is not, as the panel would have it here, an "obvious" violation of state law (much less a felony committed in the officer's presence), *see* 919 F.3d at 1146–47; rather, "officers need only '*reasonable suspicion*'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien*, 574 U.S. at 60 (emphasis added) (citation omitted). Moreover, "[a] seizure for a traffic violation *justifies a police investigation of that violation*. '[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called "*Terry* stop" . . . than to a formal arrest.'" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (emphasis added) (citation omitted). Thus, by explicitly endorsing traffic stops of non-Indians for violations of state law on state highways within the reservation, the Supreme Court implicitly but unmistakably endorsed the concomitant power to conduct an on-the-spot *investigation* of a reasonably suspected state-law violation.

**3**

*Third*, *Strate*'s citation of *Schmuck* further confirms both of these observations and puts definitively to rest any suggestion that *Strate* overruled *Ortiz-Barraza*. *Schmuck* refutes the panel decision's core premises, which are that (1) the *Terry*-style investigative authority recognized in *Ortiz-Barraza* can *only* be justified as an exercise of the tribe's plenary power to exclude non-Indians from *tribal* lands, and (2) therefore (after *Strate*) that authority does not extend to state highways and other non-tribal lands within the reservation. 919 F.3d at 1141–42.

As *Schmuck* explained, "the Tribe's authority to stop and detain is not necessarily based *exclusively* on the power to exclude non-Indians from tribal lands, but may also be derived from the Tribe's general authority as sovereign." 850 P.2d at 1341. Noting that the standards set forth in

*Montana*, 450 U.S. at 563–66, define a tribe's authority over non-Indians on fee land within the reservation, the *Schmuck* court held that the on-the-spot power to stop and detain non-Indian violators of state law rested on the tribe's power "'over the *conduct of non-Indians on fee lands within its reservation when that conduct threatens* or has some direct effect on the political integrity, the economic security, or the *health or welfare* of the tribe.'" 850 P.2d at 1341 (emphasis in original) (quoting *Montana*, 450 U.S. at 566) (relying on the "second" *Montana* exception to the general rule against asserting regulatory jurisdiction over non-Indians on fee land); *see also Duro v. Reina*, 495 U.S. at 697 ("Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them" by transporting them, if non-Indians, "to the proper authorities"). On that basis, *Schmuck* expressly "agree[d] with the Ninth Circuit" when we held in *Ortiz-Barraza* that a tribe has "the power to detain when a non-Indian is traveling on a public road." 850 P.2d at 1340–41. The "public roads remain part of the Reservation and are within the territorial jurisdiction of the Suquamish tribal police, *at least for the limited purpose of asserting the Tribe's authority to detain and deliver alleged offenders*." *Id*. at 1341 (emphasis added).[6]

---

[6] Earlier in its opinion, the *Schmuck* Court noted that, in the circumstances of that case, in which the officer did not know whether the person he was stopping was an Indian or a non-Indian, the power to pull over any suspected violator could also be viewed as a necessary ancillary power to the tribe's authority to enforce *tribal* law against *tribal* members (*i.e.*, the third power described above, which was addressed in *Bressi*). 850 P.2d at 1336–37. But *Schmuck* does not state that a tribal officer lacks the power to stop and detain reasonably suspected lawbreakers *known* to be non-Indian. On the contrary, as explained, *Schmuck* states that "the Tribe's authority to stop and detain" non-

The sole authority cited by the *Strate* Court on the issue of tribal traffic stops of non-Indians on state highways—namely, *Schmuck*—was thus one that (1) expressly endorsed *Ortiz-Barraza*; (2) explained that the tribal power to stop non-Indians on state highways rested, not just on the power to exclude (as the panel would have it), but also on the tribe's sovereign power to protect its members; and (3) expressly rejected the view that this "limited" authority did not apply to non-Indians on state highways.  The concurrence buries its response to *Schmuck* in a footnote, claiming that the Supreme Court cited *Schmuck* merely "to emphasize the *limits*" of tribal detention authority.  *See* Concurrence at 9 n.1.  This argument is non-responsive, because it ignores *Schmuck*'s description of the power that is included *within* those limits—namely, the *Ortiz-Barraza* power to detain and investigate non-Indians based on reasonable suspicion.  Far from indicating a rejection of *Ortiz-Barraza*, the Supreme Court's citation of *Schmuck* can only be viewed as an *endorsement* of our decision in *Ortiz-Barraza*.

## C

The standard for a three-judge panel to find that intervening higher authority has overruled one of our precedents is high—*Ortiz-Barraza* must be "clearly irreconcilable" with *Strate*.  *Miller v. Gammie*, 335 F.3d at 900.  Here, for the reasons set forth above, there is no conflict between *Strate* and *Ortiz-Barraza* at all.  On the contrary, *Strate* affirmatively supports *Ortiz-Barraza*.  But at a minimum, the above analysis of *Strate* shows that it *can* easily be reconciled with *Ortiz-Barraza*, and under *Miller v.*

---

Indians fits comfortably within the tribe's general sovereign authority to protect the tribal community from criminal and dangerous behavior.  *Id.* at 1341.

*Gammie*, the panel was bound to read the cases consistently, if possible, rather than to adopt a reading that purports to overrule a prior three-judge panel decision.[7]

In the proceedings below, the district court granted Cooley's motion to suppress based solely on the ground that Officer Saylor lacked the authority to detain and investigate a non-Indian for a suspected violation of state or federal law on a state highway.[8] Because, under *Ortiz-Barraza*, Officer Saylor clearly had such authority, the district court's order should have been reversed.

## IV

Even if the panel were correct in concluding that, as a matter of federal Indian law, Officer Saylor lacked authority to conduct an on-the-spot investigation of a non-Indian motorist on a state highway within the reservation, the panel separately erred in further holding that this absence of

---

[7] The concurrence's heavy reliance on *Bressi* seems almost to suggest that *Ortiz-Barraza* should no longer be considered good law because (in the concurrence's view) it is inconsistent with *Bressi*. But, of course, *Bressi* had no authority to overrule *Ortiz-Barraza* and did not purport to do so. And if the concurrence were right in insinuating that there is a conflict between *Ortiz-Barraza* and *Bressi*, that would be yet another reason why we should have reheard this case en banc. In any event, *Bressi* is distinguishable from *Ortiz-Barraza* because *Bressi* addressed the scope of tribal power to conduct "*suspicionless* stop[s] of non-Indians" on public roads. 575 F.3d at 896 (emphasis added).

[8] Although the encounter here began, not as a *Terry*-stop, but as a "welfare check" of the occupants of a vehicle sitting by the side of the highway, Saylor's subsequent actions during that encounter rested upon the sort of detention and investigatory authority covered by *Terry*.

authority violated Fourth Amendment principles applicable
to Indian tribes under ICRA, 25 U.S.C. § 1302(a)(2).

After concluding that Saylor exceeded the scope of his
authority as a tribal officer, the panel analogized this case to
that of an officer executing a warrant, or conducting an
arrest, outside the officer's *geographic* jurisdiction.
919 F.3d at 1145–48. Such a search or seizure, the panel
held, would presumptively violate Fourth Amendment
principles "even if the officer had sufficient substantive
grounds to conduct it." *Id*. at 1145. Accordingly, the panel
concluded, Saylor's actions were consistent with "ICRA's
Fourth Amendment parallel *only* if, under the law of the
founding era, a *private citizen* could lawfully take those
actions." *Id*. at 1148 (emphasis added). Because Saylor
exceeded that private-citizen authority, his eventual seizure
of Cooley during the encounter violated Fourth Amendment
principles. *Id*. And because private citizens had no power
*at all* to search under the common law of the founding era,
Saylor's searches also necessarily violated ICRA's Fourth
Amendment parallel. *Id*.

The panel's reasoning fails at the very first step, because
its analogy to a geographically extra-territorial arrest is
wrong. Here, Saylor did *not* act outside his *territorial*
jurisdiction, because all of his actions took place *within* the
reservation and in Indian country. The concurrence suggests
that Saylor *did* act outside his territorial jurisdiction because
his actions took place on a highway that, under *Strate*, is
"'equivalent, for [non-Indian] governance purposes, to
alienated, non-Indian land.'" Concurrence at 10 (quoting
*Strate*, 520 U.S. at 454) (footnote omitted) (alteration made
by concurrence). But alienated, non-Indian land is still land
*within* the reservation. *See* 520 U.S. at 446 ("'non-Indian fee
lands' … refers to *reservation land* acquired in fee simple by

non-Indian owners") (emphasis added). As a result, the tribe's "power over nonmembers on non-Indian fee land is sharply circumscribed," *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 650 (2001), but it is *not* non-existent. Instead, the tribe may only exercise the limited powers set forth in *Montana*'s two exceptions. *Strate*, 520 U.S. at 456. Thus, the problem here (if any) is *not* that Saylor acted outside his territorial jurisdiction—he did not do so—but rather that his actions were not within the scope of his authority to perform under the applicable law *within* his geographic jurisdiction. Saylor would have had such authority had he been "deputized" under Montana law to enforce Montana criminal law against non-Indians within the reservation, but as the panel noted, no such cross-designation agreement exists between the Crow Tribe and any state or local law enforcement agency. *See* 919 F.3d at 1141 & n.2; *cf.* Mont. Code Ann. §§ 18-11-101 *et seq.* (authorizing such "state-tribal cooperative agreements").

The proper analogy is thus not to an official acting outside his or her territorial jurisdiction. *See United States v. Henderson*, 906 F.3d 1109, 1117 (9th Cir. 2018) (magistrate judge's issuance of warrant to be executed outside the geographic bounds of the judge's district violated the Fourth Amendment); *see also State v. Eriksen*, 259 P.3d 1079, 1083–84 (Wash. 2011) (tribal officer had no authority to arrest non-Indian outside reservation, even though he had pursued her from inside the reservation; limited *Montana* authority over non-Indians was unavailable outside reservation boundaries). Rather, the proper analogy is to an officer acting without the necessary *state-law authorization* to take certain investigatory actions *within* that officer's geographic jurisdiction. And under settled Supreme Court and Ninth Circuit precedent, an officer's lack of authorization under state law to conduct an otherwise

reasonable search and seizure within that officer's territorial jurisdiction does not violate the Fourth Amendment. *See*, *e.g.*, *Moore*, 553 U.S. at 176 (fact that Virginia law prohibited arresting defendant for driving on a suspended license was immaterial to the Fourth Amendment analysis; "while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections"); *Martinez-Medina*, 673 F.3d at 1037 (although "deputy sheriff lacked the authority under Oregon law to apprehend Petitioners based solely on a violation of federal immigration law," under "*Moore*, the deputy sheriff's violation of Oregon law does not constitute a Fourth Amendment violation"); *Saunders*, 473 Fed. App'x at 770 (although "Silva, as a Deputy Animal Control Officer within the Yavapai County Sheriff's Office, lacked the authority to conduct an arrest," such "'state restrictions [on arrest authority] do not alter the Fourth Amendment's protections'") (alterations in original) (quoting *Moore*, 553 U.S. at 176); *see also Johnson v. Phillips*, 664 F.3d at 235, 238 (although arresting officer, as "an Auxiliary Reserve Police Officer, . . . lacked authority under state law to conduct a traffic stop or arrest," that did "not establish that his conduct violated the Fourth Amendment").

The panel purported to distinguish *Moore* on the grounds that there is no contention here that Saylor "act[ed] in *violation* of state (or federal) law," and that the defect instead is that Saylor exceeded the sovereign powers of a tribe by investigating Cooley. 919 F.3d at 1147–48 (emphasis added); *see also* Concurrence at 10 (contending that *Moore* only applies when state "restrictions" are violated). But as the cases cited above show, *Moore* also applies when (as here) the asserted defect is that the officer lacks the necessary *authorization* under state law to conduct a particular search or seizure within that officer's territorial

jurisdiction.  *See supra* at 41–42; *see also Moore*, 553 U.S. at 171 ("In *Cooper v. California*, 386 U.S. 58 (1967), we reversed a state court that had held the search of a seized vehicle to be in violation of the Fourth Amendment because state law did not explicitly *authorize* the search.   We concluded that whether state law *authorized* the search was irrelevant.") (emphasis added).   Here, Saylor could have seized Cooley, and searched his vehicle, had he been deputized to do so under Montana law, but this purely state-law deficiency is irrelevant under *Moore*.   The historical authorities on which the panel relies, which address searches and seizures outside an officer's geographic territorial jurisdiction, *see Cooley*, 919 F.3d at 1145–47, bear no resemblance to the issue in this case.

The concurrence suggests that the distinction between lack of authorization and lack of territorial jurisdiction makes no sense, because even the defect in *Henderson* could be recast as a lack of authorization.  *See* Concurrence at 10. The point is a bit ironic, because (as the panel notes in its opinion) that is essentially the reason that the Third and Tenth Circuits gave for *declining* to find that extraterritorial arrests in another state violate the Fourth Amendment. 919 F.3d at 1147.**[9]**   For the panel to suggest a converse

---

**[9]** Thus, for example, the Tenth Circuit held that even geographically extraterritorial arrests by an officer do not violate the Fourth Amendment under *Moore* because the defect is merely the absence of authorization under the law of the neighboring state.  *See United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012) ("In particular, we specifically reject Mr. Jones's assertion that . . . '[w]hen a person is seized outside the state jurisdictional limit of a law enforcement officer who is acting without a warrant, that person's Fourth Amendment constitutional right to be free from unreasonable seizures has been violated.'").  That broader question is not presented here, because Saylor did not act outside the geographic boundaries of the reservation.   But the Tenth Circuit's

rule—that every lack of authorization should be treated as equivalent to acting outside one's territorial jurisdiction— would be flatly contrary to *Moore*.

## V

The fact that the panel's decision conflicts with controlling Supreme Court and Ninth Circuit precedent, and with decisions of other appellate courts, is alone enough to warrant our rehearing this case en banc. *See* Fed. R. App. P. 35(b)(1)(A). But the "exceptional importance" of the questions presented in this case provides yet an additional reason. *See* Fed. R. App. P. 35(b)(1)(B). Raising the bar for tribal investigations of non-Indian misconduct on fee lands from reasonable suspicion to "probable-cause-plus" is a very big deal, and one that literally may have life-or-death consequences for many of the hundreds of thousands of persons who live on Indian reservations located within this circuit. In particular, three factors underscore the significant practical importance of the issues raised by this case.

*First*, in many cases, the amount of reservation land that is held in fee by non-Indians (and thus covered by the panel's rule) is high. For example, in *Oliphant*, the Court noted that, for the reservation at issue there, "approximately 63%" of the total acreage was "owned in fee simple absolute by non-Indians." 435 U.S. at 193 n.1. The Court likewise noted in *Montana* that 28% of the land in the Crow Indian reservation—the one at issue in this case—was "held in fee by non-Indians." *Montana*, 450 U.S. at 548.

---

decision in *Jones* underscores that the panel's analysis reflects a circuit split on this point.

*Second*, the number of non-Indians on reservations is also significant. According to the most recent census report, roughly 77 percent of the 4.6 million people who live in "American Indian areas" (which includes reservations, off-reservation trust areas, and other tribal areas) are non-Indian. Tina Morris, Paula L. Vines, & Elizabeth M. Hoeffel*, The American Indian and Alaska Native Population: 2010*, U.S. Census Bureau 13–14 (2012), https://www.census.gov/history/pdf/c2010br-10.pdf (last visited Jan. 13, 2020). Although the inclusion of non-reservation tribal areas in this statistic precludes directly extrapolating from that statistic the exact overall percentage of non-Indians on *reservations*, it nonetheless suggests that the number is not insignificant. Reservations appear to vary widely on this score: for the reservations in this circuit with the largest Indian populations, the percentage of non-Indians residing on the reservation ranges from a high of 68% on the Flathead Reservation in Montana to 1.2% on the Blackfeet Reservation in Montana. *See id*. at 14.

*Third*, the volume of criminal activity within reservation boundaries is in many cases higher than in other parts of the country. Indian reservations "experience violent crime rates two and a half times higher than the national average." Kevin Morrow, *Bridging the Jurisdictional Void: Cross-Deputization Agreements in Indian Country*, 94 N.D. L. Rev. 65, 68 (2019). Traffic offenses are a serious issue, with the Centers for Disease Control and Prevention concluding that adult "motor vehicle-related death rates" for American Indians and Alaska Natives "are more than twice that of non-Hispanic whites or blacks." *Tribal Road Safety: Get the Facts*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/motorvehiclesafety/native/factsheet.html (last visited Jan. 12, 2020). "Alcohol-related offenses are exceptionally problematic on tribal lands." *Fresh Pursuit*

*from Indian Country: Tribal Authority to Pursue Suspects onto State Land*, 129 Harv. L. Rev. 1685, 1690 (2016).

In light of these factors, the troubling consequence of the panel's opinion will be that tribal law enforcement will be stripped of *Terry*-stop investigative authority with respect to a significant percentage (and in some cases a majority) of the people and land within their borders.[10]    Instead, tribal officers responding to disturbances on fee lands will be limited, in the case of non-Indians, to intervening only with respect to "obvious" or "apparent" crimes, or perhaps only with respect to felonies committed within the officer's presence.  Given the resulting practical significance to day-to-day maintenance of public order within this circuit's many Indian reservations, the panel's opinion in this case is as disturbing as it is mistaken.

Further, the practical problems created by the panel's decision are unlikely to be resolved by other sources of law enforcement authority.  In particular, states may not have the resources to adequately monitor, on their own, the state and federal highways that traverse Indian land.  Montana's eighth highway patrol district, for example, encompasses three of the state's seven tribal reservations (the Blackfeet, Rocky Boy's, and Fort Belknap Reservations), but is only policed by 17 full-time highway patrol officers as of 2018. *See* Mont. Highway Patrol, *2018 Annual Report* 8, https://dojmt.gov/wp-content/uploads/2018-MHP-AR-for-

---

[10] The concurrence uses three emphases to express its astonishment at the notion that "tribal police could stop, investigate, and detain *known* non-Indians *anywhere* within the boundaries of a reservation for *any* reasonably suspected crime."  Concurrence at 7–8.  Of course, that is precisely what *Ortiz-Barraza* held and what has been the law in this circuit for more than four decades.  The only thing that is astonishing is that the concurrence finds this astonishing.

web.pdf (last visited Jan. 12, 2020); Mont. Governor's Off. of Indian Aff., *Tribal Nations*, Montana.gov, https://tribalnations.mt.gov/tribalnations (last visited Jan. 12, 2020). Unsurprisingly, it has been observed that "Tribal officers"—not state or county officers—"are often the first responders to investigate offenses that occur on the reservation, even if it is ultimately determined that jurisdiction lies in state or federal court." *State v. Kurtz*, 249 P.3d 1271, 1279 (Or. 2011).

Nor is cross-deputization a panacea to the problems wrongly created by the panel's decision, because many tribes seem unwilling to make the trade-off inherent in such a relationship. For example, of the three Montana Indian reservations that rely predominantly on their own tribal law enforcement, apparently only one has a cross-deputization agreement. *See District of Montana Indian Country Law Enforcement Initiative Operational Plan*, The U.S. Attorney's Office, District of Mont. 1, 7 (2016), https://www.justice.gov/usao-mt/page/file/934476/download (last visited Jan. 12, 2020). More generally, "fifty-two tribes in the continental United States are unable to enforce state laws on their reservations without a specific local agreement." Morrow, *supra*, 94 N.D. L. Rev. at 77. BIA law enforcement is likewise apparently not a cure-all: the Crow Tribe, which currently has a contract for law-enforcement services with the BIA, recently announced that, due to the perceived "ineffective police services" of the BIA, it is in the process of "transitioning" that contract "to the Crow Tribe Law Enforcement Department." Crow Tribe of Indians, *Press Release*, Facebook (Nov. 20, 2019, 5:18 PM), https://www.facebook.com/OfficialCTINews/posts/for-immediate-releasenovember-20-2019press-release-crow-agency-mt-the-crow-tribe/736936106823458/ (last visited, Jan. 12, 2020).

By any definition, a legal issue of such potential practical significance to the safety and welfare of hundreds of thousands of our fellow citizens is exceptionally important.

I respectfully dissent from the denial of rehearing en banc.